UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# CV - 09 3342

-------------------------------------------------------------------------x

TARA INCANTALUPO, Individually and as Parent
of Minor Child Vince Incantalupo, STEPHEN
JACKSON, Individually and as Parent of Minor Child
Sekou Jackson, ANDREW LEVEY, Individually and as
Parent of Minor Children Gabrielle Levey and Ryan Levey,
STACEY SULLIVAN, Individually and as Parent of Minor
Children Jack Sullivan, Bryan Sullivan, Jade Sullivan, and
Kate Sullivan, FU-YUN TANG, Individually and as Parent
of Minor Child Arthur Chen, and all others similarly situated,

No.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 0 4 2009 ★

LONG ISLAND OFFICE

Plaintiffs,

- against -

**VERIFIED COMPLAINT**

LAWRENCE UNION FREE SCHOOL DISTRICT
NUMBER 15, the BOARD OF EDUCATION OF
THE LAWRENCE UNION FREE SCHOOL DISTRICT
NUMBER 15, MURRAY FORMAN, Individually and
in His Official Capacity as Board President and Trustee,
DAVID SUSSMAN, Individually and in His Official
Capacity as Trustee, URI KAUFMAN , Individually
and in His Official Capacity as Trustee, ASHER
MANSDORF, Individually and in His Official Capacity
as Trustee, MICHAEL HATTEN, Individually and in His
Official Capacity as Trustee, SOLOMON BLISKO,
Individually and in His Official Capacity as Trustee,
and NAHUM MARCUS, Individually and in His Official
Capacity as Trustee,

# HURLEY, J.

# BOYLE, M.

Jury Trial Demanded

Defendants.

-------------------------------------------------------------------------x

Plaintiffs, TARA INCANTALUPO, STEPHEN JACKSON, ANDREW LEVEY,

STACEY SULLIVAN, and FU-YUN TANG, on behalf of themselves and their minor children,

by and through their attorneys, BARNES & BARNES, P.C., complaining of the defendants

herein, allege, upon knowledge as to themselves and their own actions, and upon information and

belief as to all other matters:

## JURISDICTION & VENUE

1.    This is a civil action based upon defendants' violations 42 U.S.C. §§ 1983, 1985 and 1986 to redress defendants' deprivation of the rights, privileges and immunities secured to plaintiffs by the First and Fourteenth Amendments to the Constitution of the United States, and all related provisions of the New York State Constitution, and any other causes of action which can be inferred from the facts set forth herein.

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343(3), and (4), 1367, 2201.  The supplemental jurisdiction of the Court (28 U.S.C. § 1367) is invoked over state law causes of action arising under New York State law.

3.    Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4.    At all times hereinafter mentioned, plaintiff TARA INCANTALUPO ("Incantalupo") was and is a resident of the County of Nassau, specifically residing within, and subject to the tax levy of the LAWRENCE UNION FREE SCHOOL DISTRICT NUMBER 15, ("LUFSD" or "District").

5.    At all times hereinafter mentioned, Incantalupo was and is the parent of Vince Incantalupo, a minor child who recently completed the third grade course curriculum at LUFSD Elementary School Number 6 ("Number 6 School") located in Woodmere, NY.  Neither Incantalupo nor her minor child is an adherent of Orthodox Judaism.

6.    At all times hereinafter mentioned, plaintiff STEPHEN JACKSON ("Jackson") was and is a resident of the County of Nassau, specifically residing within, and subject to the tax levy of LUFSD.

7.    At all times hereinafter mentioned, Jackson was and is the parent of Sekou Jackson, a minor child who recently completed the fourth grade course curriculum at LUFSD

2

School Number 2 ("Number 2 School").  Neither Jackson nor his minor child is an adherent of Orthodox Judaism.

8.      At all times hereinafter mentioned, plaintiff ANDREW LEVEY ("Levey") was and is a resident of the County of Nassau, specifically residing within, and subject to the tax levy of LUFSD.

9.      At all times hereinafter mentioned, Levey was and is the parent of Gabrielle Levey, a minor child who recently completed the fifth grade course curriculum at Number 6 School, and Ryan Levey, a minor child who recently completed the second grade course curriculum at Number 6 School.  Neither Levey nor his minor children are adherents of Orthodox Judaism.

10.     At all times hereinafter mentioned, plaintiff STACEY SULLIVAN ("Sullivan") was and is a resident of the County of Nassau, specifically residing within, and subject to the tax levy of LUFSD.

11.     At all times hereinafter mentioned, Sullivan was and is the parent of Jack Sullivan, a minor child who recently completed the fifth grade course curriculum at Number 6 School, Bryan Sullivan, a minor child who recently completed the second grade course curriculum at Number 6 School,  Jade Sullivan, a minor child who recently completed the kindergarten course curriculum at LUFSD School Number 4 ("Number 4 School"), and Kate Sullivan, a minor child who recently completed the pre-kindergarten program at Number 4 School.   Neither Sullivan nor her minor children are adherents of Orthodox Judaism.

12.     At all times hereinafter mentioned, plaintiff FU-YUN TANG ("Tang") was and is a resident of the County of Nassau, specifically residing within, and subject to the tax levy of LUFSD.

3

13.     At all times hereinafter mentioned, Tang was and is the parent of Arthur Chen, a minor child who recently completed the fifth grade course curriculum at Number 6 School. Neither Tang nor her minor child is an adherent of Orthodox Judaism

14.     At all times hereinafter mentioned, defendant LUFSD was and is a public school district and municipal corporation organized and existing under the laws of the State of New York, and a recipient of federal and state financial assistance.

15.     At all times hereinafter mentioned, defendant BOARD OF EDUCATION OF THE LAWRENCE UNION FREE SCHOOL DISTRICT NUMBER 15, ("Board" or "Board of Education") was and is the governing corporate body of the District, and a municipal corporation organized and existing under the laws of the State of New York.

16.     At all times hereinafter mentioned, defendant MURRAY FORMAN ("Forman") was and is an elected Trustee of the LUFSD Board of Education, and is currently serving as the President of the LUFSD Board of Education.

17.     At all times hereinafter mentioned, defendant DAVID SUSSMAN ("Sussman") was and is an elected Trustee of the LUFSD Board of Education.

18.     At all times hereinafter mentioned, defendant URI KAUFMAN ("Kaufman") was and is an elected Trustee of the LUFSD Board of Education.

19.     At all times hereinafter mentioned, defendant ASHER MANSDORF ("Mansdorf") was and is an elected Trustee of the LUFSD Board of Education.

20.     At all times hereinafter mentioned, defendant MICHAEL HATTEN ("Hatten") was an elected Trustee of the LUFSD Board of Education.  Hatten did not run for reelection in 2009, and his term of office expired in or about July 2009.

21.     At all times hereinafter mentioned, defendant NAHUM MARCUS ("Marcus") was and is an elected Trustee of the LUFSD Board of Education.

4

## FACTUAL BACKGROUND

A. *Evolution of LUFSD and the Community*

22.     LUFSD is a school district providing tuition-free, public education to students residing within a defined geographic sphere in Nassau County, New York. Included within this sphere are the towns and/or villages known as: Lawrence, Inwood, Woodmere, and Cedarhurst. Collectively, this area (including Hewlett and Hewlett Harbor) is often referred to as the "Five Towns" area of Long Island. The LUFSD also encompasses the towns of Atlantic Beach and Meadowmere Park.

23.     Through much of its history, LUFSD was renowned for the superior education provided to its pupils. At one time, the District was considered among the premier school districts on Long Island, and in the State of New York.

24.     Traditionally, until the early-to-mid 1980's, the community served by the LUFSD was comprised of a diverse demographic population. This population contained individuals who identified themselves as members of various religious and/or ethnic backgrounds, including Judaism.

25.     Thereafter, the community began to experience a significant shift in demographics. Specifically, the community experienced (and still continues to experience) an influx of individuals identifying themselves as adherents of a sect of Judaism known as Orthodox Judaism ("Orthodox"). While this population further consists of various sub-denominations of the Orthodox faith, all identify themselves as members of the (overarching) Orthodox Jewish religion.

5

26.     The vast majority of these individuals established residency first within the Village of Lawrence. Gradually thereafter, the Orthodox population spread to other parts of the Five Towns area.

27.     Currently, all segments of the Five Towns area maintain sizeable Orthodox populations, and these populations continue to flourish and expand. Nevertheless, the Village of Lawrence itself remains the epicenter of the Orthodox community in the Five Towns area.

28.     The Orthodox sect of Judaism differs significantly from other variants of the religion. Orthodox Jews, for example, are known for their strict interpretation of, and adherence to, the Old Testament of the Bible.

29.     The religious beliefs attendant to Orthodox Judaism are manifested in adherents' diets, wardrobes, personal grooming habits, and even family size. For illustrative purposes, in accordance with the Bible's command to "be fruitful and multiply; [p]opulate the earth abundantly and multiply in it[,]" Orthodox families are known for their large nuclear family units. This represents only one example of the strict biblical interpretation, and the (profound) corresponding effects, of Orthodox doctrine on its members' lives.

30.     The foregoing effects can be so pronounced, Orthodox Judaism oftentimes represents  more than just a religion to its followers; it is a culture and lifestyle as well. As such, Orthodox congregations can and regularly do develop unique distinctions from surrounding communities which render them, in essence, separate cultural, ethnic, political, and socio-economic groups. These groups in turn possess their own shared values, beliefs, interests, and political agendas, which are taught and passed onto future generations.

6

31.    The primary manner in which Orthodox congregations teach and disseminate their combined religious, cultural and political values is through private seminaries, known as "yeshivas." Yeshivas are not designed to supplement the education received by a child in public schools. To the contrary, they are designed to (and do) *replace* the public education to which Orthodox children, like all children, are otherwise entitled.

32.    In this sense, attendance at yeshivas represents a central tenet of the Orthodox faith. Generally, those Orthodox Jews who possess the requisite financial means are expected to send their children to yeshivas. Here, they are educated in standard course curriculum (math, English, etc.), blended with theological and ideological studies that perpetuate the Orthodox religion, culture, and lifestyle.

33.    In LUFSD, the yeshiva system has helped to create a community that is insular and isolated from its' surrounding communities. Indeed, consistent with the deliberate, non-integrative approach to education referred to above, the yeshiva system has fostered distinctive values and interests that separate the Orthodox community from surrounding communities.

34.    Oftentimes, Orthodox values and interests manifest in the form of political ideologies (and corresponding political agendas). To wit, Orthodox communities have been known to utilize bloc-voting techniques to support public policies that favor Orthodox interests. In this sense, Orthodox religious convictions can and often do coalesce with sociopolitical platforms to form a single construct that renders Orthodox Judaism a religion, and, in neighborhoods such as the Five Towns area, a *de facto* political affiliation.

35.    The Orthodox community has and steadily continues to grow in the Five Towns area. Currently, the majority of all children within LUFSD borders is now enrolled in private

7

schools, with the vast majority of those attending yeshivas. Children within LUFSD borders who actually utilize the public school system now represent the minority within the District.

36.     The above influx, aside from being visibly apparent to residents, also began to reveal itself in the political arena as well. Specifically, as Orthodox numbers grew, so did Orthodox involvement in the affairs of LUFSD.

37.     The reason for this increased involvement is attributable to mixed religious, sociopolitical, and socioeconomic concerns. Yeshiva education is expensive. Tuition costs can be financially burdensome to many Orthodox families, who must also pay the property taxes that sustain the public schools. Such is the case in LUFSD.

38.     As they expanded, the Orthodox community began to politically assert itself (in earnest) in or about 2000 and 2001. The aim of this involvement was to limit Orthodox contributions to the public school system so as to divert financial resources toward Orthodox interests, and, in particular, toward yeshiva tuition.

39.     In or about 2001, a former LUFSD District Superintendent made a pivotal announcement that foretold a fundamental change in the relationship between the Orthodox and non-Orthodox communities in LUFSD.

40.     At or about this time, it was announced that the District had all but spent its (once) vast cash reserves. Much of these reserves existed by virtue of a prior sale of an elementary school, the proceeds of which were used to curb tax increases without disrupting educational programs. The Superintendent simultaneously announced that a tax increase would be needed to sustain the operating budget in the coming scholastic year.

8

40.     Deeply unsatisfied with this development, the Orthodox community began to mobilize. After and through a concerted effort, much of which took place in "shuls" (a/k/a Jewish Orthodox temples), in or about 2002, the Orthodox community mounted a successful campaign to defeat the LUFSD proposed school budget.

41.     At or about this time, the first Orthodox individual, Asher Mansdorf, was elected to the BOE. Upon information and belief, Mansdorf's own children attended from and/or graduated from a yeshiva, and never attended public school.

42.     Following the 2002 budget defeat, the District was forced to adopt a state-mandated "contingency budget," (a/k/a "austerity budget") pursuant to N.Y. Education Law § 2023.

43.     In general, contingency budgets impose drastic restrictions on a Board's power to make expenditures for educational programs, equipment, and facilities. Specifically, contingency budgets: (a) practically eliminate a Board's ability to make necessary expenditures for capital repairs and improvements, except in exigent circumstances; (b) hampers purchasing, even for items such as textbooks; (c) prevents technology upgrades for students, faculty and administration; (d) severely limits a Board's ability to make monetary transfers and draw on District accounts when needed; and (e) constrains other forms of spending to account for revenue shortfalls that typically accompany budget defeats.

44.     Ultimately, contingency budgets injure the intended recipients of District expenditures: the children. When on contingency budget, a school system rarely possesses the resources needed to achieve and sustain academic excellence.

45.     In this light, it is (in equal parts) telling and unnerving that a District such as LUFSD, situated in one of the wealthiest neighborhoods on Long Island, operated on contingency for any length of time.

46.     Nevertheless, history repeated itself in 2003, when the budget was again defeated following an aggressive campaign in the Orthodox community. At or about this time, the second openly Orthodox individual, Solomon Blisko, was elected to the BOE. Upon information and belief, Blisko's own children attended private yeshivas, and none were ever enrolled in LUFSD.

47.     The budget was also defeated (and the District operated on a contingency budget) in 2004, 2005, and 2006. Upon information and belief, voting statistics maintained by the District confirm that the areas which voted against budget were located in and around the Village of Lawrence (i.e. the center of the Orthodox community), while secular neighborhoods, such as Atlantic Beach and Inwood, voted in favor of it.

48.     During this time, there were insufficient funds to address badly needed capital repairs. For example, it was only *after* the LUFSD High School's auditorium ceiling nearly collapsed in 2005 that the District was finally permitted to commence with the necessary repair work.

49.     In addition to the state-imposed spending caps during this time, the District was forced to deal with crushing transportation costs attendant to the busing of students to private yeshivas in Nassau County, Queens County, and sometimes even into Manhattan.

50.     For example, in 2005, students enrolled in private schools within LUFSD numbered approximately 4,000, while only 3,400 students were enrolled in the public school system. As the District is required by state law to provide transportation services to all students

within its boundaries, this helped push transportation costs over $7,000,000. Upon information and belief, this figure represents a significantly higher proportion of the budget than elsewhere on Long Island and in the state.

51.     During the contingency budget years, there was a rapid decline in state of the District's facilities and the range of educational services it offered. Test scores fell, the District's reputation declined, and the District was put on a New York State educational watch-list for underperforming school districts.

52.     Accordingly, in 2004, to appease the growing Orthodox contingent within LUFSD, the BOE voted to close Elementary School Number 1 ("Number 1 School"). This decision was designed to provide the added revenue needed to propose a modest budget that would (hopefully) be passed by the voters. At or about this time, Murray Forman, another Orthodox individual whose children attended yeshivas in lieu of LUFSD, was elected to the BOE.

53.     Moreover, in an effort to ensure passage, the BOE proposed a budget in 2005 that was actually *less* than the amount LUFSD would have been granted under the state-controlled contingency budget. This, too, was done with the hope that the voters would permit the BOE to take the measures needed to restore LUFSD to prominence; measures that were impossible to take while on contingency.

54.     Nevertheless, despite the increased revenue from the school sale, and despite the modest budget proposal, the Orthodox community still campaigned against the budget, which was again defeated in 2005.

55.     The reason for this defeat owed to the Orthodox community's unwillingness to give "free reign" back to the BOE for spending purposes.   Such a scenario could have posed a risk of depleting the funding available for Orthodox interests, especially yeshiva tuition payments.

56.     Shortly after the 2005 budget defeat, and in light of the now-desperate situation in LUFSD, the BOE voted to petition the New York State Department of Education ("NYSED") to ease some of the strictures associated with contingency budgeting.

57.     However, the foregoing vote was not unanimous.  Both Mansdorf and Forman voted *against* sending the petition, and thus in favor of having the District remain on a contingency budget.  As contingency budgets are detrimental to school children, Mansdorf's and Forman's vote audaciously placed private religious interests over the public school children who they were elected to serve.

**B.**     ***The Orthodox Majority on the BOE* : 2006-2007**

58.     After years of mounting tension within LUFSD created by five (5) consecutive budget defeats, the Orthodox community ran a vigorous campaign to take a majority (four of seven seats) on the BOE.  The two candidates placed on the ballot were Uri Kaufman and Michael Hatten.  Upon information and belief, both of these individuals enrolled their own children in yeshivas, and never attended public schools in LUFSD.

59.     Kaufman and Hatten's campaign, which was widely supported by and within the Orthodox community (including synagogues and local periodicals), offered a contradictory platform.  On one hand, the candidates supported enhanced services to the private school population that did not even use the public schools (i.e. yeshiva students), **and**, simultaneously,

12

lower taxes. This platform was especially amazing, and revealing, in light of the fact that the District was still on a contingency budget at the time, offering limited services to public school students.

60.    Specifically, the candidates, like the two Orthodox incumbents on the BOE at the time (Mansdorf and Forman), were ardent supporters of free, pre-kindergarten ("Pre-K") transportation services to all private school students. Given the number of yeshivas and Pre-K programs in the area, this would have presented an oppressive cost to the District. Likewise, the platform espoused the view that Orthodox community groups, such as little league sports, etc., should not be required to pay a fee in order to access LUFSD's fields and facilities.

61.    Contemporaneous to these revenue-depleting proposals, the Orthodox candidates and incumbents had the temerity to propose a flat tax (i.e. 0% tax increase) for the upcoming fiscal year. All of these (utterly transparent) positions were designed to aid religious tenets and interests, at the expense of the public school population that Board members are elected to serve.

62.    Moreover, the foregoing platform was designed to convert the BOE, a *public* body, into a proxy for the Orthodox shuls in the Five Towns area. Likewise, it was also meant to strike a crushing blow to the non-Orthodox, LUFSD-using student population in favor of the yeshiva-using private school population.

63.    In or about May 2006, Kaufman and Hatten were elected to the BOE, thus creating the first-ever "Orthodox majority" on the BOE. This was and is a term used by Mansdorf, Forman, Kaufman and Hatten (and successive Orthodox BOE members) *to describe themselves*. The two new Trustees were slated to take their respective oaths of office in or about July 2006.

13

64.    However, shortly after Kaufman and Hatten were elected, in or about June 2006, the outgoing BOE completed negotiations with New York State United Teachers ("NYSUT"), which is the duly-certified union and collective bargaining agent for teachers in LUFSD.

65.    While the new collective bargaining agreement ("CBA" or "contract") proposed (upon information and belief) the smallest raise in teacher salary on Long Island that year, the Orthodox incumbents and Trustee-elects nevertheless railed against the new contract.

66.    To wit, at the public meeting of the BOE on June 20, 2009, Trustee-elect Kaufman was the first public speaker after it was announced that the CBA-authorizing resolution had passed, and proceeded to castigate the audience of public school parents who cheered its adoption.

67.    Specifically, Kaufman began his diatribe by stating:

> I am directing my comments not at the private school parents so much but at the public school parents. You *public school parents* . . . I haven't even begun and already you're not listening.

> You know, I'm looking out right now and you're all so happy, you're clapping, you're cheering, you've all got smiles on your faces because the contract has been passed, you couldn't be happier. Do you really think you've the big winners in all this? Do you really think you've gained from this?

After threatening the crowd with the closing remark: "two weeks" (referring to his official swearing-in date), Kaufman finally returned to his seat after security guards approached him.

68.    Kaufman's condescending remarks, chastising "you public school parents," were nothing short of astonishing in light of the fact that he had just been elected to the *public* BOE, serving *public* school children. Thus, even before Kaufman took his oath of office, there was no doubt as to where his loyalties laid. From the outset, he has openly expressed (and acted upon)

14

his preference for the interests of the private religious community over those of the public school children that he was elected to serve.

69.     Furthermore, at this same meeting, Mansdorf issued a veiled threat to the non-Orthodox population, stating that the new CBA would force the new BOE to make "difficult choices" regarding future LUFSD funding.

70.     The reason for the vitriolic response offered by the Orthodox Trustee-elects and incumbents had nothing to do with teacher compensation issues, as claimed by Kaufman. Rather, it was attributable to a new provision in the CBA that set forth maximum student enrollment in classrooms (e.g. "caps"). This provision conflicted with Forman's avowed goal to "warehouse the children" of the District.

71.     Specifically, the (soon-to-be) Orthodox majority feared that the new clause could be used to subdue District "consolidation", i.e., school closures. While consolidation was already feared at the time of the May 2006 elections, in light of recent events within LUFSD (described in section "C", below), it is now clear that consolidation was the Orthodox majority's overarching objective from the moment they took control of the BOE.

72.     When the Orthodox majority took control of the BOE in July 2006, they quickly acted to implement their hybrid religious/political agenda. Specifically, it was announced that, despite years of austerity budgeting, the District would hold a referendum to determine whether (District-sponsored) Pre-K busing would be offered to private school students.

73.     Not surprisingly, the Orthodox community, which stood the most to gain from Pre-K busing, voted in approval of the BOE resolution in the ensuing referendum.

15

74.    At the time the BOE presented their resolution (offering the referendum), the issue was portrayed by the Orthodox majority as an matter of equality and fairness, that is, fairness to the private school community which paid taxes to LUFSD and was (allegedly) entitled to busing under State law.

75.    Despite this, in a maneuver that conclusively established their intent, the Orthodox majority included within the referendum a patchwork of rules deliberately designed to ensure that the only private schools eligible for Pre-K busing were yeshivas. Quite clearly, the Orthodox majority had no interest in funding busing services for other religious denominations and private programs.

76.    This is illustrated, first and foremost, in the net result of the guidelines passed by the BOE. Specifically, under these new rules, the following Orthodox yeshivas became eligible to receive Pre-K busing: Yeshiva Ketana, Hebrew Academy of Long Beach, Yeshiva Darchei of Far Rockaway, Yeshiva of the South Shore, Brandeis School, Hebrew Academy of the Five Towns, Torah Academy for Girls and Bnot Shulamith. However, under these same rules, the following non-Orthodox, private schools/programs, which were otherwise eligible, were excluded: Five Towns Community Center, Mothers' Center of Nassau County, Lawrence Woodmere Academy, Long Beach Catholic, Holy Name of Mary, Jewish Center of Atlantic Beach (non-Orthodox), Jack and Jill Montessori School, Long Beach Montessori School, Temple Israel (non-Orthodox), Crossroads School, Debaun Pre-K, Rolling River School & Day Camp, Our Lady of Peace, and On Our Way Learning Center

77.    Amazingly, the BOE defended these discriminatory new rules despite the fact that they operated to exclude all other non-Orthodox Pre-K programs from the busing "entitlement."

16

Equally disturbing was that this represented yet another bald-faced effort to empty the public fisc at the expense of innocent children, and in favor of the Orthodox religious interests and dogma which compels attendance at yeshivas.

78. However, and despite their best efforts, the putative Pre-K busing program was ultimately overturned by NYSED in a published decision. The basis of the decision was that Pre-K busing was not specifically authorized by the N.Y. Education Law.

79. The District subsequently appealed this ruling in a N.Y. CPLR Article 78 petition filed in the Supreme Court of the State of New York, County of Nassau. In ruling against the District, the Court made the following holding: "the voters of a district cannot authorize a board of education to take actions that are *ultra vires* under the Education law."

80. Aside from Pre-K busing, the Orthodox majority took other measures intended to divert public monies to Orthodox interests. Specifically, the BOE quietly instituted its campaign pledge to stop charging community groups for access to fields and facilities. Notably, upon information and belief, the only such groups that initially received notice of this policy change were Orthodox community groups.

81. Additionally, upon the Orthodox majority's election in July 2006, the BOE announced plans to modify a previous BOE resolution which authorized two propositions in a forthcoming referendum. Prior to the May 2006 elections, the first of these propositions authorized the final sale and conveyance of Number 1 School. The second authorized the transfer of the sale proceeds ($27 million) to a capital reserve fund.

82.  The second proposition was (originally) intended to ensure that the sale proceeds of School Number 1 went to fund badly needed capital repairs and improvements throughout the District, which had been neglected during the contingency years.

83.  However, upon taking office in July 2006, the Orthodox majority immediately dropped the second proposition from the ballot, as this would have substantially limited their ability to use the proceeds for anything other than capital repairs and improvements.

84.  The Orthodox majority was not interested in funding capital repairs and improvements in LUFSD, but, rather, funding the Orthodox community.  Accordingly, after the first proposition was adopted by the voters, the bulk of the sale proceeds went toward a tax-relief reserve fund, where they could be used to curb tax increases and/or sponsor rebates.

85.  Consistent with their scheme, the proceeds from the sale of Number 1 School have, in fact, been used to sponsor tax breaks (to help sponsor Orthodox interests, especially yeshiva tuition).

86.  Indeed, sometime after the foregoing referendum, the BOE announced a flat (0%) tax for the upcoming (2007/08) school year.  The Orthodox majority expressed satisfaction in this diversion of public funds (intended to repair crumbling buildings) to the Orthodox community, particularly for yeshiva tuition.

87.  The Orthodox majority also had other, creative ways to accomplish the foregoing objective.  For instance, after they took control of the BOE in July 2006, one of the first items on the agenda was state-subsidization of Orthodox special education students at private yeshivas. This came to be known as the "Kulanu" issue.

18

88.     Kulanu was and is the name of a yeshiva, opened in the early 2000's, specifically intended for special education students. It was the first of its kind in the Five Towns community. For a period of time after it opened, it operated despite being unaccredited and uncertified by New York State.

89.     Shortly after Kulanu opened, many Orthodox parents, who had previously used LUFSD's renowned special education program, requested that the District pay to send their children to Kulanu, instead.

90.     However, parents must petition the BOE to accomplish this, and ultimately, it is the local BOE which must determine the proper venue for a special education student.

91.     For a time during the early-to-mid 2000's, many petitions were rejected on account of the fact that Kulanu, an uncertified school, was not the best or proper forum for provision of special education services. Between 2004 and July 2006, approximately sixteen "Kulanu petitions" were rejected. All rejections were upheld after numerous appeals were filed by the Orthodox parents.

92.     Accordingly, when Kaufman and Hatten ran for office, they campaigned on the platform that the BOE, by rejecting the Kulanu petitions, had engaged in discrimination against the Orthodox population.

93.     Consequently, after their election to the BOE in July 2006, the Orthodox majority effectuated a "settlement" with all Kulanu petitioners, which enabled all of their children to attend Kulanu, forthwith. Disturbingly, this "settlement" was reached irrespective of the individual needs of the special education children.

19

94. Equally disturbing was that this so-called "settlement" granted partial tuition subsidies (approximately 50%) for all of the Kulanu petitioners' children. While LUFSD is required to provide and pay for special education services, these services are supposed to performed "in-house." LUFSD it is not obligated, except in extremely rare circumstances, to provide tuition reimbursement for instruction provided at private religious institutions. The current subsidization program thus contravenes basic First Amendment principles.

95. Likewise, it represents a direct example of the on-going diversion of public money to Orthodox interests. Especially revealing is that this subsidization was provided at a time when the District was still operating on contingency, and in a state of crisis.

96. Through these and other actions, it is readily apparent that the Orthodox majority is quick to disregard their spirited advocacy and platform of "fiscal responsibility" when there is a compelling Orthodox interest at stake.

97. Furthermore, the Orthodox majority's reference to the Kulanu matter as a "settlement" is a pretext designed to conceal their unlawful scheme. Clearly, if the preceding BOE had sixteen (16) of the Kulanu rejections sustained from 2004 to July 2006, there was no need for a "settlement" to begin with.

98. As illustrated through the actions outlined above, the Orthodox majority clearly had interpreted their July 2006 elective victory as a mandate to convert the *public* BOE into an Orthodox ruling committee, and to establish Orthodox Judaism as the official religion of LUFSD. This pattern persists today.

20

99.     In 2007, the Orthodox majority added to their numbers when Nahum Marcus, an ordained Orthodox rabbi, was elected to the BOE. Upon information and belief, Marcus' children attend or attended yeshivas, and never attended public school.

100.    Thus, by the beginning of 2008, the Orthodox majority consisted of five (5) Orthodox individuals, none of whom had (upon information and belief) actually sent their children to the public school system they served.

101.    Moreover, the Orthodox majority also claimed one non-Orthodox member, David Sussman, as an ally on the BOE. Sussman had repeatedly catered to Orthodox interests throughout the 2000's, and by 2007, he was considered a trusted confidant of the Orthodox majority.

102.    Accordingly, when Sussman is included, the Orthodox majority actually consisted of six, out of seven, total BOE seats. In 2008, Mansdorf and Blisko, both of whom had left the BOE for a time, were reelected. This gave the Orthodox majority seven out of seven possible seats on the BOE, and, along with it, unfettered power.

C.     *The Latest Dispute: The "Consolidation Plan"*

103.    Against this backdrop, in 2007, the Orthodox majority on the BOE initiated the central component of its plan to (literally) dismantle LUFSD in order to further their hybrid religious/political agenda at the expense of the children who they were elected to serve.

104.    Specifically, in or about 2007, the BOE retained Stanton Leggett & Associates ("Stanton Leggett"), a renowned consulting firm specializing in demography and educational planning/infrastructure, to conduct a study and analysis of consolidation options within the

21

District. The individual who oversaw the project was Paul Abramson, the President of Stanton Leggett.

105.   The BOE's purpose for retaining Stanton Leggett was to provide a pretextual basis upon which to justify their (pre-determined) decision to close a specific school in the District. The school selected for closure by the Orthodox majority on the BOE was, and always has been, Number 6 School.

106.   Number 6 School, located in Woodmere, NY, is the largest elementary school within the District. Additionally, it is the **newest** elementary school, and in the **best physical condition**. Furthermore, it is the **only** elementary school with large, grass athletic fields. These fields are so desirable, they are routinely used to host Lawrence High School and Middle School sports and activities. Number 6 School is also the **only** elementary school with **a stand-alone gymnasium and auditorium**; these functions are combined in the other schools. Moreover, the school is the **only** elementary school that is currently **handicapped-accessible**. Finally, the school is situated on a **much larger parcel** than any of the remaining elementary schools.

107.   Due to the sheer size and scope of its land and facilities, Number Six School possesses the greatest resale and/or rental value among LUFSD elementary schools. The size of the parcel, situated in a heavily congested area, renders the school particularly valuable for resale as it can support new and/or remodeled premises thereon.

108.   In light of the foregoing, Number 6 School represents the obvious target for a group, such as the Orthodox majority, whose goal is to funnel tax dollars from public schools to private religious interests. Upon information and belief, the Orthodox majority on the BOE

intends to use the sale and/or rental proceeds from School Number 6 to fund a flat tax and/or tax rebates, just as it did with the sale proceeds of School Number 1.

109.   Moreover, it represents a prime and readily available opportunity for a scholastic institution that may wish to utilize the property, namely, a yeshiva.  Upon information and belief, the Orthodox majority's ultimate intention is to sell or lease School Number 6 and/or its surrounding property to a yeshiva.

110.   Such a sale or lease would have a "multiplier" effect on the LUFSD. Aside from the further diversion of public funds needed to (a) repair dilapidate buildings, (b) update antiquated technology and infrastructure, and (c) attract quality teachers (all to fund Orthodox interests, particularly yeshiva tuition), by bringing more Orthodox families into the community, it has the effect of adding the Orthodox community's religious/political base.

111.   As such, the nefarious nature Orthodox majority's plan to unlawfully divert pubic monies to private religious causes is unequivocal.

112.   Nevertheless, when the Stanton Leggett Report was issued in February 2008, the Orthodox majority's plans suffered a setback.  In this report, it was determined that LUFSD schools were actually *over-utilized* when evaluated in conjunction with presently-accepted educational standards.  Specifically, it was determined that, of the 99 classrooms existing at LUFSD elementary schools, **fewer than 17 meet current minimum standards**.

113.   The Stanton Leggett Report also observed that:

23

"There has been some talk of adding another grade (fifth grade) to the [Lawrence Middle School] building. Central administration currently occupies the equivalent of eight classrooms on the main floor. Additionally, there are central administration offices and shops on the ground floor, largely in space not suitable for students. If central administration moved from its existing offices, with significant remodeling, **there would be classroom space for an additional 160 to 200 students**. It would take further study to determine if needed support space could be provided.

114. Despite these warnings, at a public BOE meeting in November 2008, the BOE gave a PowerPoint presentation where various consolidation options were presented to the audience. Essentially, the presentation suggested that the only viable consolidation option entailed moving fifth graders from their separate elementary schools to the Middle School, and closing an elementary school. Conveniently, the Stanton Leggett Report's findings, with respect to student capacity limitations in the Middle School and elementary schools, were omitted from the PowerPoint presentation.

115. Subsequently, in December 2008, the Orthodox majority instituted the first phase of its plan to slowly dismantle the District. Specifically, it was announced that, beginning in the 2009/2010 school year, the entire fifth grade class would be moved to the Lawrence Middle School, to join the sixth, seventh and eighth grade classes already in the building. Previously, the fifth graders had always been taught in the separate elementary schools.

116. This decision, which was protested by the non-Orthodox community in LUFSD, pitted together pre-pubescent, ten-year-old fifth graders with adolescent eighth graders. Such a scenario is considered academically unsound, and to be avoided wherever possible. Simply stated, the children operate at different maturity levels, and mixing the two can adversely affect the development of either or both.

117. However, and consistent with their religious/political agenda, the Orthodox majority was not concerned with the best interests of the children when it made this decision. Rather, it was concerned only with nurturing the false impression that the elementary schools were underutilized and essentially empty.

118. This is evinced through the Orthodox majority's contemptuous disregard for that portion of the Stanton Leggett Report which observed that the Middle School could only house an additional 160 to 200 students. Notably, the current Fourth Grade Class, along with the current Third and Second Grade Classes, all have more than 200 children enrolled.

119. In this light, the next three Fifth Grade classes will be crowded into a school that is undersized and insufficient to accommodate their educational needs. Likewise, the Sixth, Seventh and Eight Grade Classes are also adversely and unlawfully impacted by the Orthodox majority's discriminatory policies, as they too will be crowded into a Middle School that is inadequate to accommodate them.

120. Every year, school districts are required to submit capital improvements plans, for all of its schools in operation, to NYSED. In or around January 2009, the District submitted said in connection with all of its elementary schools, except for Number 6 School.

121. The reason LUFSD did not submit the required plans for Number 6 School is because the BOE had, by this time, already made the decision to close it. This, in turn, obviated the need for a timely capital improvement plan.

122. Finally, at a public BOE meeting on March 24, 2009, the Orthodox majority announced its intent to close School Number 6. The manner of the announcement was a sudden BOE vote to close the school, wherein the Orthodox majority, without any explanation to the

25

audience, voted unanimously in favor of the closure.  When asked for an explanation at the meeting, all Trustees declined.

123.    Asked subsequently, BOE Trustees have given various, and sometimes divergent, reasons for its otherwise unnecessary consolidation plan.

124.    For instance, one reason frequently cited for the consolidation plan was "declining student enrollment."  However, the Stanton Report, which was authorized and paid for by the BOE itself, clearly indicated that the elementary schools are currently *over*-utilized.  The same report indicated that the Middle School could not sustain the arrival of more than 200 additional students, even after reconstruction. It is thus apparent that the BOE's "declining enrollment" rationale, which blatantly ignores its' own consultant's findings, is nothing more than a thinly-veiled pretext used to conceal a discriminatory agenda.

125.    Another reason subsequently provided to justify the consolidation plan is the current economic state of the nation.  However, the pretextual nature of this highly-speculative argument is revealed by the fact that, in light of the poor economy, some Orthodox parents may/will no longer be able to afford costly yeshiva tuition.  This prefigures an increase, not a decrease, in LUFSD enrollment (with the influx of Orthodox students), and suggests that LUFSD should not be closing schools at this time.

126.    Additionally, to disseminate one of its more ridiculous pretextual reasons to justify its consolidation plan, the Orthodox majority dispatched Superintendent Fitzsimons to write an editorial in a local periodical.  In this article, Fitzsimons suggested that student safety concerns prompted the closure of Number 6 School.  Specifically, Fitzsimons hinted that mold

26

formation was possible on the site, and that a patio-collapse was attributable to soil erosion caused by the high water table.

127. However, Fitzsimons' (wholly theoretical) argument is belied by the fact that mold was never uncovered in the building, a fact he admits in the article. Moreover, his argument fails to consider that most of the Five Towns area was built on coastal wetlands. Thus, moisture damage is a pervasive and unavoidable problem throughout the community.

128. This includes other LUFSD schools, where actual (not theoretical) mold and/or mildew were uncovered earlier this year. Clearly, if the BOE was truly interested in addressing mold issues, then it would have started by abating it where it exists already, instead of by closing down schools where it has not even formed yet. This again shows the pretextual nature of defendants' arguments.

129. Fitzsimons rationale is further undercut by the fact that a large yeshiva, owned and operated by the Hebrew Academy of Long Beach, is located approximately one block away from School Number 6. The functionality of this school demonstrates that moisture damage is not a disabling characteristic of the land in the area.

130. It is notable that Fitzsimons, a paid LUFSD employee serving at the pleasure of the BOE, was tapped to write this commentary. The Orthodox majority, on account of the anemic and pretextual nature of the argument set forth in the article, displayed their cowardice by not attaching their own names to it.

131. In addition the foregoing, the Orthodox majority has indicated that high costs of repair contributed to the BOE's selection of Number 6 School for closure. The argument was specifically championed by Kaufman in a letter to a local periodical.

27

132.    His argument, however, was belied by an email exchange between Abrams (Stanton Leggett's President) and Fitzsimons, which was obtained via Freedom of Information Law ("FOIL") request.

133.    In this email, Abrams states that if any school should be closed, School 4 is the obvious choice as it "needs the most work." Abrams also states that eliminating the problems in Number 4 School's basement will be "very difficult and costly," and that the building compares unfavorably to the other schools in terms of "age, condition and facility."   He also refers to Number 4 School as the "poorest building" among the elementary schools.

134.    Even more tellingly, Abrams makes the following observation in his email, which reveals the true, unlawful intent inherent in the BOE's consolidation plan:

> Using Schools 2, 5 and 6 means keeping the three best buildings in use for the foreseeable future. **Closing 6 may have a political purpose** but it's the district's **best school** in terms of age, facilities and size. . . .

135.    Moreover, Abrams concluded his email by stating:

> If the objective is to support the best possible educational program for the Lawrence Public schools, [closing Number 4 School] would probably save money in the sense that [it] will need a great deal of upgrading.  Of course, **if the objective is to sell the most valuable building (or the one that would bring the most income if sold) then school 4 does not fit the bill.  I would hope the board would chose educational strength.**

136.    Aside from establishing the pretextual nature of Kaufman's comments regarding repair costs, the foregoing email firmly establishes several other things as well.

137.    Specifically, it establishes that Number 6 School's closure was not premised on the educational needs of the students who the Orthodox majority is elected to serve.  To the

28

contrary, it establishes that the only purpose for closing Number 6 School was "political", that is, to serve Orthodox interests.

138.    The manner in which the consolidation plan was designed to serve the Orthodox's community's interests was by providing the optimal revenue source to fund flat taxes and/or rebates, to (in turn) pay for yeshiva tuition.  To wit, Abrams was even quoted recently as stating that he was "shocked" by the BOE's decision to shutter Number 6 School, and that the BOE did not want to sell its least desirable school, School Number 4, because the BOE "didn't see it as the same value in terms of resale."

139.    As illustrated above, the Orthodox majority on the BOE, in a concerted effort to divert public monies to support the religious precept of yeshiva enrollment, and in order to establish Orthodox Judaism as the official religion of LUFSD, has utterly abandoned its duties to the innocent public school children who they are elected to serve.

140.    Plaintiffs' minor children are all directly impacted by this unlawful conduct.  To wit, Vince Incantalupo, Ryan Levey, Bryan Sullivan, and Jade Sullivan would have all attended Number 6 School next year had it not closed pursuant to defendant's unlawful Consolidation Plan.  Katie Sullivan would have attended Number 6 School in two years, had it not closed. Adding to this injury is that all of these children will now be forced to attend other overcrowded schools that do not suitably accommodate their educational needs

141.    Likewise, Sekou Jackson is directly impacted by defendant's unlawful Consolidation Plan as he will now attend fifth grade classes in Lawrence Middle School (due to the Consolidation Plan), in an environment that is overcrowded and unsuitable to accommodate his educational needs.

29

142.    Gabrielle Levey, Jack Sullivan, and Arthur Chen are also directly impacted by defendants' unlawful Consolidation Plan, as all will be forced to attend an overcrowded Middle School that does not suitably accommodate their educational needs.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST LUFSD, AND THE LUFSD BOARD OF EDUCATION
### (42 U.S.C. § 1983 – First Amendment)

143.    Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

144.    LUFSD and its Board of Education took the aforementioned actions in violation of the rights secured to plaintiffs' minor children through the First Amendment, based on their (non-Orthodox Jewish) religions and/or political affiliations/associations.

145.    LUFSD and its Board of Education have, in and through the actions described above, unlawfully made laws and public policies regarding the establishment of religion.

146.    Defendants have, while acting under color of state law, deprived plaintiffs' minor children, and plaintiffs (as taxpayers) of their constitutional rights, as secured by the First Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983, and all related provisions of the New York State Constitution. Defendants intentionally committed, condoned or were deliberately indifferent to the aforementioned violations of the constitutional rights of plaintiffs' minor children.  Such deliberate indifference may be inferred in the following ways:

(A)    Defendants custom or practice of discriminating and/or retaliating against plaintiffs based on constitutionally protected religious and/or political affiliations/associations. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

30

(B)    Supervisors failed to properly investigate and address allegations of discrimination, and the abridgement of the First Amendment rights of plaintiffs' minor children;

(C)    Inadequate training/supervision was so likely to result in the discrimination and the abridgement of rights that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

(D)    Policymakers engaged in and/or tacitly condoned the discrimination and abridgement of rights.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST LUFSD, AND THE LUFSD BOARD OF EDUCATION**
**(42 U.S.C. § 1983 – Fourteenth Amendment)**

147.    Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

148.    LUFSD took the aforementioned actions without any rational basis, based on the religious and/or political affiliations/associations of plaintiffs and their minor children.

149.    Defendants have, while acting under color of state law, deprived plaintiffs and their minor children of their constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983, and all related provisions of the New York State Constitution. Defendants intentionally committed, condoned or were deliberately indifferent to the aforementioned violations of these constitutional rights. Such deliberate indifference may be inferred in the following ways:

(A)    Defendants' custom or practice of discriminating and/or retaliating against plaintiffs' minor children based on religious and/or political affiliation/association. The discriminatory practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers.

31

(B) Supervisors failed to properly investigate and address allegations of discrimination.

(C) Inadequate training/supervision was so likely to result in the discrimination that policymakers can reasonably be said to have been deliberately indifferent to the need to provide better training and supervision.

(D) Policymakers engaged in and/or tacitly condoned the discrimination.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST THE INDIVIDUAL DEFENDANTS
## (42 U.S.C. § 1983 – First Amendment)

150. Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

151. The individual defendants unlawfully contributed to, and otherwise condoned the aforementioned discrimination and abridgement of rights, in violation of 42 U.S.C. § 1983.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST THE INDIVIDUAL DEFENDANTS
## (42 U.S.C. § 1983 – Fourteenth Amendment)

152. Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

153. The individual defendants unlawfully contributed to, and otherwise condoned the aforementioned discrimination and/or retaliation, in violation 42 U.S.C. § 1983.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
## (42 U.S.C. § 1985)

154. Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

155.   Defendants jointly and collectively conspired to violate plaintiffs children's First Amendment rights by creating, promoting, fostering, encouraging and implementing an illicit, preconceived scheme to discriminate against public school children on account of religion and/or political affiliation/association.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
## (42 U.S.C. § 1986)

156.   Plaintiffs repeat and reallege the allegations set forth above with the same force and effect as if fully set forth herein.

157.   Defendants separately and collectively had, or should have had, knowledge of the aforementioned conspiracy.

158.   Defendants separately and collectively had the power to prevent or aid in preventing the commission of the aforementioned conspiracy, but unlawfully neglected or refused to do so.

WHEREFORE, by reason of defendants' unlawful actions described above, plaintiffs and their minor children have suffered great pain, mental anguish and physical injury.  They are thus entitled to all forms of compensatory damages, punitive damages (against the individual defendants), equitable relief (including but not limited to enjoining the District from implementing its Consolidation Plan and/or enjoining the sale, conveyance, lease or transfer of School Number 6), plus attorneys' fees and costs, and any other damages or remedies permissible under law.  Plaintiffs request a jury trial on the issues presented herein.

Dated: Garden City, NY
      July 31, 2009

                               BARNES & BARNES, P.C.
                               1461 Franklin Avenue
                               Garden City, NY 11530
                               (516) 673-0674

              By: _____
                               Robert M. Agostisi (RA0071)
                               Of Counsel

## VERIFICATION

STATE OF NEW YORK    )
                           ) ss:
COUNTY OF ~~SUFFOLK~~   )
         Nassau

      Tara Incantalupo, being duly sworn, deposes and says:

      I am, along with my minor child or children, a plaintiff in this action. I have reviewed the foregoing Verified Complaint, know the contents thereof, and attest that it is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

                                Tara Incantalupo

Sworn to Before Me on This
23rd Day of _July_, 2009

Notary Public

LINDA L. ROONEY
Notary Public, State Of New York
No. 30-4704099
Qualified In Nassau County
Commission Expires May 31, 20 _11_

## __VERIFICATION__

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF SUFFOLK          )

Stephen Jackson, being duly sworn, deposes and says:

I am, along with my minor child or children, a plaintiff in this action.  I have reviewed the foregoing Verified Complaint, know the contents thereof, and attest that it is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

Stephen Jackson

Sworn to Before Me on This
___ Day of _____, 2009

Notary Public

DANIELLE R. SMALLWOOD
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires December 14, 2013

## <u>VERIFICATION</u>

STATE OF NEW YORK   )
                             ) ss.:
COUNTY OF NASSAU    )

      Andrew Levey, being duly sworn, deposes and says:

      I am, along with my minor child or children, a plaintiff in this action.  I have reviewed the foregoing Verified Complaint, know the contents thereof, and attest that it is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

_____<br>Andrew Levey

Sworn to Before Me on This
2 8th Day of _July_ , 2009

_____
Notary Public

LINDA L. ROONEY
Notary Public, State Of New York
No. 30-4704099
Qualified In Nassau County
Commission Expires May 31, 20 _11_

## VERIFICATION

STATE OF NEW YORK     )
           *NASSAU*    ) ss:
COUNTY OF ~~SUFFOLK~~    )

      Stacey Sullivan, being duly sworn, deposes and says:

      I am, along with my minor child or children, a plaintiff in this action. I have reviewed the foregoing Verified Complaint, know the contents thereof, and attest that it is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

_____
                       Stacey Sullivan

Sworn to Before Me on This
___ Day of _____, 2009

_____
Notary Public

LINDA L. ROONEY
Notary Public, State Of New York
No. 30-4704099
Qualified In Nassau County
Commission Expires May 31, 20 11

## **VERIFICATION**

STATE OF NEW YORK    )
                              ) ss:

COUNTY OF NASSAU    )

        Fu-Yun Tang, being duly sworn, deposes and says:

        I am, along with my minor child or children, a plaintiff in this action.  I have reviewed the foregoing Verified Complaint, know the contents thereof, and attest that it is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

_____
                                    Fu-Yun Tang

Sworn to Before Me on This
27th Day of _July_ , 2009

_____
Notary Public

LINDA L. ROONEY
Notary Public, State Of New York
No. 30-4704099
Qualified In Nassau County
Commission Expires May 31, 20 _11_