UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
TARA INCANTALUPO, STEPHEN JACKSON,
ANDREW LEVEY, STACEY SULLIVAN, and
FU-YUN TANG,

                    Plaintiffs,

       -against-                  <u>MEMORANDUM AND DECISION</u>
                                     09-CV-3342 (JS)(AKT)

LAWRENCE UNION FREE SCHOOL DISTRICT
NUMBER 15, THE BOARD OF EDUCATION
OF THE LAWRENCE UNION FREE SCHOOL
DISTRICT NUMBER 15, MURRAY FORMAN,
DAVID SUSSMAN, URI KAUFMAN,
ASHER MANSDORF, MICHAEL HATTEN,
SOLOMON BLISKO, and NAHUM MARCUS,

                    Defendants.
------------------------------------X

APPEARANCES:
For Plaintiffs:       Robert M. Agostisi, Esq.
                      Barnes & Barnes, P.C.
                      1461 Franklin Avenue
                      Garden City, NY 11530

For Defendants:      Brian S. Sokoloff, Esq.
                      Steven C. Stern
                      Sokoloff Stern LLP
                      355 Post Avenue, Suite 201
                      Westbury, NY 11501

                      David J. Butler, Esq.
                      Bingham McCutchen LLP
                      2020 K Street, NW
                      Washington, DC 20006

                      Roslyn Z. Roth, Esq.
                      9 Troy Place
                      Merrick, NY 11566

SEYBERT, District Judge:

          Plaintiffs Tara Incantalupo, Stephen Jackson, Andrew

Levey, Stacey Sullivan and Fu-Yun Tag ("Plaintiffs") have filed

suit against Murray Forman, David Sussman, Uri Kaufman, Asher

Mansdorf, Michael Hatten, Solomon Blisko and Nahum Marcus (collectively, "the Individual Defendants") and the Lawrence Union Free School District Number 15 and the Board of Education of the Lawrence Union Free School District Number 15 (collectively, "Lawrence Defendants"), alleging violations of their First and Fourteenth Amendment Rights. Plaintiffs have also moved for a preliminary injunction to enjoin a "Consolidation Plan" that Defendants seek to implement this September. Defendants oppose Plaintiffs' preliminary injunction motion and, instead, demand that the case be dismissed.

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is DENIED and Plaintiffs' Complaint is DISMISSED.

<u>BACKGROUND</u>[1]

Plaintiffs are residents of the Lawrence Union Free School District and the parents of children who attend the district's public schools. Compl. ¶¶ 4-13. The Individual Defendants are current and former members of Lawrence's Board of

---

[1] The Court is addressing both Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss. Because of this motion to dismiss, this Background section assumes the well-pled factual allegations in Plaintiffs' Complaint as true. These allegations are not accepted as true for purposes of Plaintiffs' preliminary injunction motion. That being said, the Court notes that - even <u>if</u> it accepted all of Plaintiffs' allegations as true, Plaintiffs would still not be entitled to injunctive relief, as the Complaint fails to state a claim.

Education ("the School Board") who support the Consolidation Plan that Plaintiffs oppose.  Id. ¶¶ 16-21.

The Lawrence Union Free School District ("Lawrence") is a school district within Nassau County, New York, serving the Village of Lawrence and much of the surrounding "Five Towns" area. Id. ¶ 22.  At one time, Lawrence had a demographically diverse population, and was known for its superior public schools.  Id. ¶¶ 23-24.

Beginning in the 1980s, Lawrence's demographic balance began to shift due to a substantial influx of Orthodox Jews. Compl. ¶¶ 24-25.  Orthodox Judaism is a form of Judaism that demands adherence to the Hebrew Bible's commandments.  Id. ¶ 28.[2] Orthodox Jews' religious beliefs manifest themselves in their adherents' diets, wardrobes, grooming habits, and their large nuclear families.  Id. ¶ 29.[3]  As a result, Orthodox Judaism

_____

[2] The Complaint also alleges that Orthodox Jews "are known for their strict interpretation" of the Hebrew Bible.  For purposes of this motion, this allegation is begrudgingly accepted as true.  But, the Court notes, it appears to be based on popular stereotypes and misconceptions regarding Orthodox Judaism, not facts.  Orthodox Judaism does not interpret the Hebrew Bible "strict[ly]," but rather in accord with the Talmud and later Rabbinic codifications, which often interpret Biblical commandments liberally.  See, generally, Ran-Dav's County Kosher, Inc. v. State, 243 N.J. Super. 232, 242 n.8, 579 A.2d 316, 321 n.8 (N.J. Super. Ct. 1990) rev'd on other grounds at 129 N.J. 141 (N.J. 1992) (noting that the Talmud and Rabbinic codifications provide the "principal source of modern-day decisions" for Orthodox Jewish practices).

[3] The Complaint makes numerous factual generalizations about Orthodox Jews.  Although the Court is forced to accept these

"oftentimes represents more than just a religion . . . it is a culture and lifestyle as well." Id. ¶ 30.  Thus, Orthodox Jewish communities constitute "separate cultural, ethnic, political, and socio-economic groups" from society-at-large, and "possess their own shared values, beliefs, interests, and political agendas, which are taught onto future generations." Id. ¶ 30.[4]

        Because Orthodox Jews want to pass their religious heritage onto their children, they primarily tend to educate their children in private seminaries, known as "yeshivas."  Id. ¶ 31. The yeshiva system replaces the public education "to which Orthodox

_____

allegations as true for purposes of the motion to dismiss, it does so with serious hesitation.  In the Court's own experience, not all individuals who practice Orthodox Judaism have different "wardrobes" or "grooming habits" than individuals of other faiths.  Similarly, not all Orthodox Jews have "large nuclear famil[ies]." Compl. ¶ 29.  In addition, the Court wishes to note that most of Plaintiffs' generalizations regarding Orthodox Jews have no relevance to their claims.  The alleged facts that most Orthodox Jews send their children to yeshivas and support the Consolidation Plan are arguably relevant.  But, among other things, whether Orthodox Jews manifest different "grooming habits" or "wardrobes" than most people is a complete non-sequitur.  Given the very real possibility that such generalizations could cause offense, Plaintiffs should have limited their "observations" about Orthodox Jews to germane issues.  Pl. Reply Br. at 9.

    [4] Again, the allegation that Orthodox Jews have a collective "political agenda[]" which they pass on to their children is accepted as true with serious hesitation.  Several factors strongly suggest that no such unified "political agenda" exists, including: (1) the Court's own experience; (2) the indisputable truth that religious believers are not monolithic robots, but rather individuals who may think differently from each other; and (3) the ideological diversity found among the few Orthodox Jews who have entered public life (such as Sen. Joe Lieberman and former Attorney General Michael Mukasey).

children, like all children, are otherwise entitled." Id. ¶ 31.
Orthodox Jews "who possess the requisite financial means are
expected to send their children to yeshivas," where they study both
secular (e.g., math, English) and parochial subjects. Id. ¶ 32.

In Lawrence, the yeshiva system "has helped to create a
community that is insular and isolated from its surrounding
communities." Id. ¶ 33.   Indeed, due to the Orthodox Jewish
community's size and preference for yeshiva education, the majority
of Lawrence's children currently attend private schools, mostly
yeshivas. Id. ¶ 35.

Orthodox Jewish values sometimes "manifest in the form of
political ideologies (and corresponding political agendas)." Id.
¶ 34.   Through bloc-voting, Orthodox Jewish communities mobilize
"to support public policies that favor Orthodox interests." Id. ¶
34.   Thus, in Lawrence, Orthodox Judaism operates as a "de facto
political affiliation." Id. ¶ 34.

Around 2000 or 2001, Lawrence's Orthodox community began
to assert itself politically. Id. ¶ 38.   At this time, the
Lawrence School District Superintendent announced that Lawrence had
spent all its cash reserves, and that the school system needed a
tax increase to sustain its operating budget. Id. 40. Because the
Orthodox community pays taxes to support public schools while
receiving little benefit from them (as they principally educate
their children in yeshivas), the Orthodox community mobilized to

limit their taxes and defeat the school district's operating budget.  Id. ¶¶ 38-40.  This campaign succeeded, and Lawrence was forced to adopt a contingency budget that limited school spending. Id. ¶ 42.  Every year following, until 2006, Lawrence proposed increasing school spending, and each time the Orthodox community mobilized to defeat it.  Id. ¶¶ 46-47.  Voting statistics show that Lawrence's heavily Orthodox areas opposed the larger school budgets, while secular neighborhoods favored them.  Id. ¶ 47.

Although operating on a smaller budget, New York State law required Lawrence to provide busing to students who went to parochial schools.  Id. ¶ 49.  The need to bus approximately 4,000 students to private schools, sometimes located far away from Lawrence, caused Lawrence's transportation budget to balloon to over $7,000,000.  Id. ¶ 50.

Due to smaller school budgets, Lawrence's public schools declined in quality.  Id. ¶¶ 48, 51.  Test scores fell, Lawrence's reputation diminished, and Lawrence was placed on New York's educational watch-list for underperforming school districts.  Id. ¶ 51.  Despite these falling scores, the Orthodox community continued to oppose giving Lawrence "free reign" to spend.  Id. ¶ 55.  Plaintiffs plead that the Orthodox did so because they feared "depleting the funding available for Orthodox interests, especially yeshiva tuition payments."  Id. ¶ 55.  This particular conclusory allegation is not accepted as true.  Plaintiffs nowhere allege that

6

any public money went to "Orthodox interests," much less "yeshiva tuition payments" specifically.  Rather, what Plaintiffs appear to actually mean by "depleting the funding available for Orthodox interests" is that Orthodox Jews opposed higher taxes, in part because they believed that higher taxes would impair their ability to afford yeshiva tuition.

In 2006, Defendants Kaufman, Hatten, Mansdorf, and Blisko won election to Lawrence's School Board.  Id. ¶¶ 41, 46, 58.  Each of these defendants are Orthodox Jews who educate their children in yeshivas, not public schools.  Id.  Their election thus created an "Orthodox Majority" on Lawrence's School Board.  Id. ¶ 63.  The Orthodox community heavily supported Kaufman and Hatten's campaigns, particularly after they campaigned on a platform of enhancing services to private schools while lowering taxes.  Id. ¶ 59.  During the campaign, Kaufman, Hatten, Mansdorf, and Blisko all supported providing free transportation services to pre-kindergarten private school students while having the "temerity" to support a "0% tax increase."  Id. ¶ 60.

Plaintiffs allege that this platform "was designed to convert [Lawrence's Board of Education] . . . into a proxy for the Orthodox shuls in the Five Towns area."  Id. ¶ 62.  Similarly, Plaintiffs allege that the "Orthodox Majority," in general, has sought to "convert the public [School Board] into an Orthodox ruling committee, and to establish Orthodox Judaism as the official

7

religion" of Lawrence.  Again, these conclusory allegations are <u>not</u> accepted as true.  Plaintiffs make no factual allegations suggesting that "Orthodox shuls" somehow controlled the School Board, that the School Board provided public money to "shuls," that the School Board served as any kind of Jewish religious court or ruling body, or that the School Board imposed sectarian religious rules favored by Orthodox Judaism.

Shortly after winning election, Defendants Kaufman, Hatten, Mansdorf, and Blisko rallied against a proposed new collective bargaining agreement with the teacher's union, which provided for a small increase in teacher salary and set forth maximum student enrollment in classrooms.  <u>Id.</u> ¶¶ 65, 70.  In particular, the "Orthodox Majority" feared that the student cap could limit their ability to save money by closing schools and increasing the number of children in each class.  <u>Id.</u> ¶ 71.

Defendants Kaufman, Hatten, Mansdorf, and Blisko also facilitated a public referendum on whether Lawrence should fund pre-kindergarten busing to private school students.  <u>Id.</u> ¶ 72.  This referendum included a patchwork of new rules designed so that only yeshivas would be eligible for the free busing.  <u>Id.</u> ¶ 75.  As a result, when the busing plan was implemented, numerous yeshivas became eligible for pre-kindergarten busing, while other private schools were not.  <u>Id.</u> ¶ 76.  The New York State Education Department subsequently overturned this busing scheme, and Lawrence

lost an Article 78 proceeding in the New York State Supreme Court attempting to get the scheme reinstated. <u>Id.</u> ¶¶ 78-79.  In addition to the busing scheme, these Defendants took other measures that supposedly benefitted Orthodox Jews, such as not charging community groups for accessing public fields and facilities. <u>Id.</u> ¶ 80.

In July 2006, these Defendants changed the terms of a forthcoming referendum on the sale of public school.  Previously, the referendum sought to ask if the funds earned from the sale should go to fund capital repairs and improvements throughout the school system. <u>Id.</u> ¶ 82.  But the "Orthodox Majority" dropped this proposition from the referendum, because they wanted to dedicate the money for a "tax-relief reserve fund" that would "curb tax increases and/or sponsor rebates." <u>Id.</u> ¶ 84.  Consistent with these efforts, the proceeds from selling the school were, in fact, used to sponsor tax breaks. <u>Id.</u> ¶ 85.  Plaintiffs allege that these tax breaks helped "sponsor Orthodox interests, especially yeshiva tuition." <u>Id.</u> ¶ 85.  Once again, this conclusory allegation is <u>not</u> accepted as true.  Plaintiffs plead no <u>facts</u> suggesting that Lawrence issued any tax breaks for "yeshiva tuition" or other "Orthodox interests." <u>Id.</u> ¶ 85.  Rather, more accurately stated, Plaintiffs appear to allege that the tax breaks gave Lawrence residents more disposable income, which some Orthodox residents then used to help afford yeshiva tuition. <u>Id.</u> ¶ 86.

Also in July 2006, the "Orthodox Majority" engineered a plan for "state-subsidization of Orthodox special education" at a private yeshiva known as Kulanu that caters to special needs children. Id. ¶¶ 87-88. Many Orthodox Jews who have special needs children wished to send them to Kulanu. Id. ¶¶ 88-89. During the early-to-mid 2000s, these parents filed many petitions requesting to opt-out of the public special education system and have Lawrence instead pay for Kulanu's tuition. Id. ¶¶ 89-91. These petitions were uniformly rejected, because Kulanu was "an uncertified school" and "not the best or proper forum for provision of special education services." Id. ¶ 91. But, once on the School Board, the "Orthodox Majority" arranged for a "settlement" with the Kulanu petitioners, enabling them to obtain partial tuition subsidies for Kulanu. Id. ¶¶ 93, 94. Plaintiffs allege that the Kulanu "settlement" was a pretext designed to conceal an unlawful subsidization of parochial education. Id. ¶ 97. Plaintiffs do not, however, assert any claims concerning the Kulanu subsidies. They "merely use the 'Kulanu' issue" to provide "context" to their claims. Pl. Reply Br. at 15.

Rather, what is before the Court is the School Board's "Consolidation Plan." The genesis of this plan took place in 2007. Compl. ¶ 103. By this time, the "Orthodox Majority" had been augmented by the election of Defendants Marcus and Sussman. Marcus is an ordained Orthodox Rabbi who sends his children to yeshivas.

<u>Id.</u> ¶ 99.  Sussman is not an Orthodox Jew, but allegedly "cater[s]" to Orthodox interests and is a "trusted confidant" of the School Board's other Orthodox Jews.  Compl. ¶ 101.

According to Plaintiffs, the School Board retained Stanton Leggett & Associates, a renowned consulting firm, to study consolidation options for Lawrence's schools.  <u>Id.</u> ¶ 104. Plaintiffs allege that the School Board hired Stanton Leggett to "justify their (pre-determined) decision" to close the Number 6 School.  <u>Id.</u> ¶ 105.  The Number 6 School is both the largest and newest elementary school in the District.  <u>Id.</u> ¶ 106.  It is the only elementary school with large, grass athletic fields, a stand-alone gymnasium and auditorium, and handicap-accessibility.  <u>Id.</u> ¶ 106.[5]  The Number 6 School's size, facilities and location renders the school particularly valuable for resale.  <u>Id.</u> ¶ 107.  Thus, according to Plaintiffs, the Defendants sought to sell or rent it so that they could "funnel tax dollars from public schools to private religious interests" through a "flat tax and/or tax rebates."  <u>Id.</u> ¶ 108.  Once again, the Court does not accept as true Plaintiff's unsupported conclusory allegation that the

_____

[5] The Stanton Leggett report, which Plaintiffs submitted as an exhibit, contradicts the allegation that School Number 6 is "the only elementary school that is currently handicapped-accessible."  Compl. #6; Agostisi Decl. Ex. 2.  This Report indicates that "School #4, School #5 and School #6 are not fully handicapped accessible," thereby implying through process of elimination that School Number 2 – not School Number 6 – is the only "fully handicapped accessible" elementary school.  <u>See</u> Agostisi Decl. Ex. 2 at "Consolidation Options Commentaries."

Defendants sought to "funnel tax dollars . . . to private religious interests."  Rather, what Plaintiffs appear to be alleging is that Defendants sought to reduce the tax burden on all Lawrence residents, and that these lower taxes would help those Lawrence residents who are Orthodox Jews finance Jewish education for their children.  Plaintiffs also claim that the Defendants ultimately seek to sell or lease School Number 6 to a yeshiva.  Id. ¶ 109.  Plaintiffs claim that such a sale or lease would have a "multiplier" effect on Lawrence by attracting more Orthodox families to the area, thereby increasing the Orthodox community's religious and political base.  Id. ¶ 110.

In February 2008, Stanton Leggett issued its report, which allegedly recommended against implementing the Consolidation Plan.  Id. ¶ 113.  Despite this report, the Defendants pressed forward with the Consolidation Plan which, among other things would move fifth graders to a middle school that presently houses the sixth through eighth grades.  Id. ¶¶ 114-116.  Defendants did so even though the Stanton Leggett Report indicated that such a move would cause overcrowding in the near future, given the present size of the second, third and fourth grade classes.  Id. ¶ 118.[6]

Finally, on March 24, 2009, Defendants announced their intent to close School Number 6.  Id. ¶ 122.  Defendants have

---

[6] Defendants dispute Plaintiffs' claims concerning the Consolidation Plan's educational merit, and claim that the Plan "comports" with the Stanton Leggett Report.  Def. Br. at 11-12.

articulated various reasons for closing the school (ranging from declining enrollment to the present economic situation to safety concerns), which Plaintiffs believe are false and pre-textual.  Id. ¶¶ 124-127.  For instance, although some of the Defendants have claimed that they want to close School Number 6 because it would cost too much to repair it, School Number 4 apparently needs more repair work.  Id. ¶¶ 132-134.  School Number 4 would, however, bring in less money if sold.  Id. ¶ 135.  Thus, Plaintiffs argue that the decision to close School Number 6 was "political," rather than educational.  Id. ¶ 137.  Specifically, Defendants want a "revenue source to fund flat taxes and/or rebates" which some Lawrence residents would then use to help pay for yeshiva tuition. Id. ¶ 138.

Plaintiffs allege that their children would all suffer injuries as a result of the Consolidation Plan.  Thus, they filed suit under § 1983, alleging violations of the First and Fourteenth Amendments, a § 1985 conspiracy, and a § 1986 conspiracy.

DISCUSSION

I.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

   A.   Standard of Review on Preliminary Injunction

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." <u>Winter v. Natural Resources Defense Council, Inc.</u>, __ U.S. __ 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). Irreparable injury must be "<u>likely</u> in the absence of an injunction"; it is not enough for a plaintiff to face some "possibility" of irreparable harm. <u>Id.</u> at 375. This is because a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Id.</u> at 376.

On its face, <u>Winter</u> appears to require a "likel[ihood]" of success on the merits. <u>Id.</u> at 374. Notwithstanding the Supreme Court's decision in <u>Winter</u>, however, the Second Circuit has continued to allow parties to obtain a preliminary injunction either through: (1) "a likelihood of success on the merits"; or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." <u>Zino Davidoff SA v. CVS Corp.</u>, 571 F.3d 238, 242 (2d Cir. 2009); <u>Faiveley Transport Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 116 (2d Cir. 2009). The Second Circuit also requires a "likelihood of irreparable injury" to the movant, but does not require any consideration of the public interest as part of the preliminary injunction standard. <u>Zino Davidoff SA</u>, 571 F.3d at 242. Because this Court sits within the Second Circuit, it will use the Second Circuit's standard, as most recently articulated in <u>Zino Davidoff</u> and <u>Faiveley</u>, post-<u>Winter</u>. The Court

14

finds, however, that Plaintiffs are not entitled to a preliminary injunction under either standard.

   B.   <u>Plaintiffs have Zero Chance of Success on the Merits</u>

        Plaintiffs argue that their claims have a likelihood of success on the merits because, Plaintiffs' contend, the Defendants' plan to sell a school and keep taxes low somehow establishes Orthodox Judaism as Lawrence's official religion.  This argument is completely frivolous.

        Within the Second Circuit, First Amendment challenges are analyzed under the familiar three-part <u>Lemon</u> test.  To survive such a challenge, a law must: (1) have a secular purpose; (2) have a principal effect that neither advances nor inhibits religion; and (3) not bring about an excessive government entanglement with religion.  <u>See</u> <u>Westchester Day School v. Vill. of Mamaroneck</u>, 504 F.3d 338, 355 (2d. Cir. 2007).[7]   The Consolidation Plan

---

        [7] Recent Supreme Court cases have focused on just the first two prongs, while ignoring the third or collapsing it within the second.  <u>See</u> <u>Mitchell v. Helms</u>, 530 U.S. 793, 807-808, 120 S. Ct. 2530, 147 L. Ed. 2d 660 (2000) ("in <u>Agostini</u> we modified Lemon for purposes of evaluating aid to schools and examined only the first and second factors.  We acknowledged that our cases discussing excessive entanglement had applied many of the same considerations as had our cases discussing primary effect, and we therefore recast <u>Lemon</u>'s entanglement inquiry as simply one criterion relevant to determining a statute's effect.") (relying upon <u>Agostini v. Felton</u>, 521 U.S. 203, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997)).  But, once again, the Second Circuit has apparently not followed the Supreme Court's guidance, and continued to apply the full three part <u>Lemon</u> test.  Consequently, so does this Court.  For the record, Plaintiffs' claims are frivolous under either standard.

indisputably meets all three prongs.

      1.   The Consolidation Plan has a Secular Purpose

The Consolidation Plan has an obvious secular purpose: to save money and thereby facilitate lower tax rates.   In fact, despite asserting an Establishment Clause claim, Plaintiffs themselves <u>plead</u> that this is the Consolidation Plan's purpose, alleging "Upon information and belief, the Orthodox majority on the BOE intends to use the sale and/or rental proceeds from School Number 6 to fund a flat tax and/or tax rebates, just as it did with the sale proceeds of School Number 1."   Lower taxes is, indisputably, a secular purpose.   Furthermore, Plaintiffs' own pleadings acknowledge that this purpose is genuine and not a sham. <u>McCreary County, Ky. v. Am. Civ. Lib. Union of Ky.</u>, 545 U.S. 844, 864, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005) (a secular purpose must be genuine).   Indeed, the Complaint repeatedly alleges that the Individual Defendants were elected on a platform of low taxes, and that an aggressive grass roots movement within Lawrence repeatedly campaigned against higher school taxes.   Compl. ¶¶ 39-41, 46, 47, 54, 55, 59, 61, 82-86.   In this regard, it is irrelevant that the Individual Defendants are not public school parents, and that the Consolidation Plan supposedly does not serve

16

any valid educational "purpose." See Compl. ¶¶ 100, 137.[8] Elected officials do not just represent beneficiaries of government programs, such as public school students.  They also represent taxpayers.  And, when those interests invariably conflict, there is no First Amendment or Equal Protection problem involved with preferring taxpayers' interests over those of beneficiaries.

2.    The Consolidation Plan's Principal Effect Neither
      Advances nor Inhibits Religion

The Consolidation Plan also passes the Lemon test because its "principal effect . . . neither advances nor inhibits religion." Westchester Day School, 504 F.3d at 355.  Plaintiffs argue that the Consolidation Plan: (1) "Advance[s] the Orthodox Jewish Religion"; and (2) has resulted in a "perceived preference" for Orthodox Judaism.  Neither of these arguments has any merit.

a.    The Consolidation Plan does not
      "Advance" Orthodox Judaism

First, Plaintiffs appear to argue that the Consolidation Plan "advances" Orthodox Judaism by having Lawrence publicly support or fund it.  Thus, to that end, Plaintiffs cite numerous cases in which school districts impermissibly funded religious schools, created segregated public schools for particular religious

---

[8] Plaintiffs' apparent argument that the Individual Defendants should not have run for elective office because they "have no investment in the public school system (aside from their tax investments) . . . that does not include their own children" is fundamentally undemocratic and improper.  See Pl. Br. at 19.

groups, or modified school rules to accommodate religious beliefs in an impermissible fashion.  _See_ Pl. Br. at 10-11 (citing _Sch. Dist. of City of Grand Rapids v. Ball_, 473 U.S. 373, 105 S. Ct. 3216, 87 L. Ed. 2d 267 (1985)); _Parents' Ass'n of P.S. 16 v. Quinones_, 803 F.2d 1235 (2d Cir. 1986); _Bollenbach v. Board of Ed. of Monroe-Woodbury Cen. Sch. Dist._, 659 F. Supp. 1450 (S.D.N.Y. 1987)).  But, although citing these cases, Plaintiffs never plead _facts_ or argue that the Consolidation Plan _directly_ supports, funds, or otherwise promotes Orthodox Judaism.  Nor could they, as the Consolidation Plan and the resulting tax savings will, in fact, confer no benefits on Orthodox Jews or Orthodox Jewish institutions not shared by other Lawrence taxpayers.

Rather, the thrust of Plaintiffs' Complaint is that the Defendants favor lower taxes (and thus, the Consolidation Plan) because lower taxes have the allegedly impermissible effect of helping Orthodox Jews afford yeshiva tuition.  But, even if not foreclosed by commonsense, any such argument would run directly afoul of the Supreme Court's consistent Establishment Clause jurisprudence.  The Supreme Court has clearly held that "where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause."

18

Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002) (collecting cases).  Applying this principle, the Court has upheld programs that, among other things: (1) provided parents with vouchers to send their kids to private (including parochial) schools; (2) provided tax deductions for religious school expenses; and (3) provided vocational assistance to a student studying at a Christian college.  Id. (vouchers are Constitutional); Mueller v. Allen, 463 U.S. 388, 103 S. Ct. 3062, 77 L. Ed. 2d 721 (1983) (tax deduction for tuition, textbooks and transportation is Constitutional); Witters v. Wash. Dept. of Serv's for the Blind,  474 U.S. 481, 106 S. Ct. 748, 88 L. Ed. 2d 846 (1986) (state program assisting the blind could fund plaintiff's studies to become a pastor, missionary or youth director).

        Here, Plaintiffs do not even complain about a government "program," per se, that sends aid to religious schools indirectly. There are no factual allegations, for instance, that the Consolidation Plan's tax savings would be targeted as a special deduction for yeshiva expenses.  Instead, Plaintiffs essentially complain about low taxes, alleging that these low taxes enable Orthodox Jews residing in Lawrence to afford parochial schools. But if, as in Mueller, tax deductions targeted at private education survive Constitutional muster, then untargeted lower taxes – which help individuals afford everything from parochial education to groceries to vacations – obviously must.

Indeed, by objecting to lower taxes <u>because</u> they might help some people afford yeshiva education, Plaintiffs' Complaint, on its clear face, seeks to <u>create</u>, not cure, a First Amendment Equal Protection violations.  Plaintiffs do not claim, nor could they, that supporting lower taxes and less school spending by itself violates the First or Fourteenth Amendment.  Thus, under Plaintiffs' reasoning, no claim would lie against political conservatives who ideologically disfavor spending on public schools, or retirees who have no children in the public school system and want lower taxes to boost their discretionary income.  Rather, Plaintiffs believe that the School Board's actions are problematic entirely because the School Board members are Orthodox Jews who are motivated, in part, to help other Orthodox Jews pay yeshiva tuition by lowering their tax burden.  In short, Plaintiffs seek to deny Orthodox Jews political rights possessed by every other group in the United States: the right to mobilize in support of religiously neutral government policies, and then have those policies enacted through normal democratic processes.  And Plaintiffs seek to do so because, Plaintiffs allege, the School Board's religiously neutral government actions are motivated by the Jewish faith, instead of anti-tax sentiment generally.

Plaintiffs thus ask this Court to discriminate against Orthodox Jews by finding that lower taxes and smaller government are unconstitutional because many of the tax cut's beneficiaries

would choose to allocate their tax savings to Jewish education rather than secular pursuits.  But if the First Amendment means anything, it is that the Government cannot prohibit individuals from spending their own money to fulfill the obligations of their religious faith.  <u>Westchester Day School</u>, 504 F.3d at 355 (the "principal effect" of a government policy cannot "inhibit" religion).  Thus, if lower taxes and school spending are not unconstitutional by themselves (and they most assuredly are not), these policies do not become unconstitutional simply because some taxpayers might spend their own money as they see fit, in support of their own preferred religious institutions.

> b.   <u>The Consolidation Plan does not Evince Any</u>
> <u>"Perceived Preference" for Orthodox Judaism</u>

Plaintiffs also argue that the Consolidation Plan has resulted in a "perceived preference" for Orthodox Judaism.  In this regard, Plaintiffs argue: (1) a current student, K.P., expressed that the School Board is "all like Jewish and . . . there's a lot of hatred against them"; (2) parents and children "stayed 'late into the night'" to protest the School Board's Consolidation Plan, and have otherwise objected to it; (3) in a pre-election advertisement, twenty-three Orthodox Rabbis urged their congregants to vote in the School Board election because of the difficulties "community members face due to rising [yeshiva] tuition costs and skyrocketing property taxes"; and (4) the Consolidation Plan makes

no educational sense.[9]

As an initial matter, the Court notes that Plaintiffs have set forth no _evidence_ that the Consolidation Plan has resulted in a "perceived preference" for Orthodox Judaism.  At most, Plaintiffs have shown that one student sees the School Board as "Jewish" and feels "hatred" for its members.  But the Supreme Court has expressly cautioned against imposing a "heckler's veto" on government policy "on the basis of what the youngest members of the audience might misperceive."  _Good News Club v. Milford Cen. Sch._, 533 U.S. 98, 119, 121 S.Ct. 2093, 150 L. Ed. 2d 151 (2001) (Christian organization's activities on school premises not unconstitutional even if small children might perceive as an endorsement of Christianity).  True, Plaintiffs also note that parents and students have opposed the Consolidation Plan.  But, if anything, Plaintiffs' evidence concerning this opposition suggests that the Consolidation Plan's opponents do _not_ "perceive" a preference for Orthodox Judaism.  For instance, Plaintiffs quote the editor-in-chief of Lawrence High School's school newspaper as

---

[9] Plaintiffs also argue that the Board's "history" in promoting Orthodox Judaism shows that the Consolidation Plan functions as an endorsement of religious doctrine.  But, although Plaintiffs' place the "history" inquiry under the _Lemon_ test's "principle or primary effect" prong, it actually goes to the question of whether the statute had a legitimate secular purpose. _See_ _McCreary County, Ky._, 545 U.S. at 866 n.14.  Here, the Board's "history" notwithstanding, even Plaintiffs acknowledge that the Consolidation Plan had the secular purpose of raising money to effectuate lower taxes.

objecting to the Consolidation Plan because, he believed, the Board is "only interested in keeping taxes low." Pl. Br. at 14. Although cited as support for Plaintiffs' position, this student apparently understands what Plaintiffs do not: that this is a dispute over fiscal and educational policy, not First Amendment issues. Similarly, Plaintiffs quote another student as expressing fears concerning "whether the adults who are in charge of the district will make the right decisions." Id. If, as Plaintiffs claim, this student "singularly captures the concerns of non-Orthodox LUFSD students," then students evidently "perceive" this conflict to be one about whether the Board will "make the right decisions" for them, not whether the Board endorses Orthodox Judaism. Furthermore, the fact that parents and students protested to the Consolidation Plan "late into the night" indicates nothing beyond their disagreement with it.

Indeed, if the submissions received by the Court are any indication, parents and students within Lawrence object to the Consolidation Plan because they disagree with it on policy or procedural grounds – not because they perceive any endorsement of religion. Thus, Gregory Wright writes that closing School Number 6 is "clearly the wrong choice." His daughter writes that she will miss her friends as School Number 6. Alice Laino writes that the decision is not based on any "well thought out, legitimate facts or plan." Marcia T. Ringleheim writes that moving 9 and 10 year old

23

children from School Number 6 is "not in their best interest." Indira Rampersaund objects to the Plan and believes that it was implemented "without input from the community."  And Lloyd Gold believes that "the current School Board . . . is looking at the Number 6 School as a financial asset and not an educational gem." Conversely, <u>none</u> of the many letters the Court has received from both parents and students substantiate Plaintiffs' claims that the public perceives the Consolidation Plan as expressing a preference for Orthodox Judaism.

Furthermore, Plaintiffs' "perceived preference" standard ignores the Supreme Court's most recent holdings on the issue.  The Supreme Court has made clear that "the endorsement inquiry is not about the perceptions of particular individuals," but rather stems from the view of a "reasonable observer aware of the history and context" of the dispute.  <u>See</u> <u>Good News Club</u>, 533 U.S. at 119 (citations and quotations omitted); <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 34-35, 124 S. Ct. 2301, 59 L. Ed. 2d 98 (2004) (O'Connor, J., concurring) (any "subjective approach" whereby a government policy becomes unconstitutional because someone perceives it as an endorsement of religion "would reduce the test to an absurdity").  Here, no "reasonable observer" would perceive a decision to close a school to save money and cut taxes as an endorsement of Orthodox Judaism.

In addition, when concerning government programs that

24

indirectly aid religious institutions through beneficiaries' personal choices (such as vouchers), the Supreme Court has made clear that any "perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." Zelman, 536 U.S. at 652. Here, once again, there is no government program that even indirectly supports religious establishments. But, even if the Consolidation Plan could be considered such a "program," then to the extent it helps Orthodox Jews fund yeshiva tuition by lowering taxes, any "perceived endorsement" is attributable to the "individual receipient[s]" of the lower taxes – not the government.

Plaintiffs also argue that a pre-election advertisement signed by twenty-three Orthodox Rabbis demonstrates that the Consolidation Plan expresses a perceived preference for Orthodox Judaism. Compl. ¶ 18  The Court notes that this advertisement concerned a school board election, not the Consolidation Plan. Id. But, even if 10,000 Rabbis endorsed the Consolidation Plan itself, such an endorsement by religion says nothing useful about whether the policy itself endorses religion. Like all Americans, clergy members have First Amendment rights. Good News Club, 533 U.S. at 121 (Scalia, J., concurring) ("a priest has as much liberty to proselytize as a patriot"). Thus, the Rev. Martin Luther King could rally against segregation without rendering integration

unconstitutional.   Catholic Priests can endorse restrictions on abortion.  Morman-affiliated organizations can campaign against gay marriage.   And Reform Judaism's Religious Action Center can advocate for health care reform.   Simply put: mere advocacy from a religious figure cannot transform an otherwise constitutionally acceptable government policy into a First Amendment violation. See, generally, Harris v. McRae, 448 U.S. 297, 319-20, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980) (fact that the Hyde Amendment's restrictions on funding abortion reflected "'traditionalist' values towards abortion," and "coincide[s] with the religious tenets of the Roman Catholic Church" in particular, does not mean that it violates the First Amendment); McDaniel v. Paty, 435 U.S. 618, 629, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978) (overturning a Tennessee law that prevented clergy members from holding certain political offices); Crowley v. Smithsonian Inst., 636 F.2d 738, 742 (D.C. Cir. 1980) ("government involvement in a subject which is also important to practitioners of a religion" is not "activity in support of religion").   Indeed, there is at least the hint of something nefarious in Plaintiffs' suggestion that a Rabbinic get-out-the-vote campaign renders an elected officials' subsequently enacted policies Constitutionally suspect.   See, generally, N.Y. Civ. Rights L. § 70-a (permitting defendants in an "action involving public petition and participation" to maintain an action, claim, cross-claim or counterclaim against the plaintiff).   After

26

all, if the Court granted Plaintiffs relief on this ground, the result would be to severely chill clergy members' free speech and petition rights – as they would fear rendering otherwise constitutionally unobjectionable legislation impermissible through their support.

Finally, Plaintiffs' claim that the Consolidation Plan must reflect Orthodox Judaism because it allegedly makes no educational sense is also frivolous.  The Consolidation may very well be terrible educational policy which will irreparably damage students.  But that is not for this Court to decide.  The Constitution does not prohibit municipalities from enacting bad public policy, and this Court cannot pontificate on the Consolidation Plan's fiscal and educational merit.  This is especially true because, as Plaintiffs' own pleading effectively concedes, the Defendants' actions had a rational basis: to reduce expenses and raise money to finance lower taxes.[10]

c.   The Consolidation Plan does not Excessively
     Entangle Lawrence with Orthodox Judaism

Plaintiffs also argue that the Consolidation Plan excessively entangles Lawrence with Orthodox Judaism.  This

_____

[10] The fact that Defendants could have chosen to close another school does not refute this rational basis.  As Plaintiffs acknowledge, School Number 6's modern facilities "renders the school particularly valuable for resale."  Compl. ¶ 107.  Thus, for the purpose of accomplishing the public policy goal of raising money for tax relief, closing and then selling School Number 6 arguably makes the most sense.

27

"entanglement," Plaintiffs argue, results from the alleged fact that most Orthodox Jews in Lawrence support the Consolidation Plan, while most of Lawrence's other residents do not.  Pl. Br. at 24-26. In this regard, Plaintiffs ask the Court to "allay the divisive religious/political strife that has overtaken the Five Towns community" by taking sides in this dispute against Lawrence's Orthodox population and "enjoining implementation of the Consolidation Plan." Pl. Br. at 24-26.

Here, Plaintiffs' argument is both blatantly undemocratic and unconstitutional.  An indisputably religiously neutral government policy (selling a school to raise money) does not violate the Constitution simply because Orthodox Jews support it while most other residents do not.  The Fourteenth Amendment to the Constitution guarantees Orthodox Jews equal protection of the law. This includes the right to run for public office and enact otherwise constitutional polices that have majority support.  To deny Orthodox Jews these rights simply because, as Plaintiffs allege, Orthodox Jews have different opinions from Lawrence's other residents would be to <u>discriminate</u> against Orthodox Jews <u>because</u> they are Orthodox Jews.  Any such discrimination would be Constitutionally and morally repugnant.

Moreover, as a practical matter, it is difficult to see how Court intervention would "allay the divisive religious/political strife" in Lawrence.  If anything, a Court

decision in Plaintiffs' favor would make this "strife" exponentially worse by discriminating against Lawrence's Orthodox population, imposing an unjust and unprecedented suspension of democracy, and imposing Plaintiffs' wishes by judicial fiat. Just as "strife" does not go away when one side loses at the ballot box, it does not magically dissipate because a Court intervenes in a bitter "religious/political" dispute.[11]   As Defendants' counsel articulated at oral argument, Plaintiffs' true remedy lies at the ballot box, not the federal court system.

> d.   The Consolidation Plan does not Otherwise Discriminate Against Non-Orthodox Students

In addition to reasons discussed above, there is an additional problem with Plaintiffs' Equal Protection claims: Plaintiffs fail to identify any suspect class that the Consolidation Plan discriminates against.   Plaintiffs argue that the Plan constitutes "purposeful discrimination" against a suspect class consisting of "the non-Orthodox population that uses the public schools."   Pl. Reply Br. at 10.   But this argument is nonsensical.   The Consolidation Plan closes School Number 6 for the entire "population that uses the public schools," both Orthodox and non-Orthodox alike.   Plaintiffs plead no facts suggesting that

---

[11] Indeed, although the Court does not discuss Winter's "public interest" prong, 129 S. Ct. at 374, in depth, it wishes to note that an injunction most assuredly would not serve the public interest, as it would amount to the Court disregarding democracy and substituting its own fiscal and educational judgment for that of Lawrence's elected officials.

Orthodox Jews who use the public schools (and Plaintiffs concede that some do) would continue to be able to attend School Number 6 even after it closes.   Similarly, Plaintiffs plead no facts suggesting that the "non-Orthodox population that uses the public schools" would not benefit in a religiously neutral way from the Consolidation Plan's fiscal rewards.   Therefore, Plaintiffs fail to identify any discrimination directed at a suspect class.   <u>See</u>, <u>generally</u>, <u>Quinn v. Nassau Co. Police Dept.</u>, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999) ("To establish an Equal Protection violation, a plaintiff must prove purposeful discrimination directed at an identifiable or suspect class").

    C.   <u>Plaintiffs have not Shown any Irreparable Legal Injury</u>

    Plaintiffs' are also not entitled to a preliminary injunction because they have failed to establish that they would suffer any irreparable <u>legal</u> injury.

    Plaintiffs first argue that they will suffer irreparable harm because the Consolidation Plan would permanently close School Number 6 and transfer fifth graders to the Lawrence Middle School. These conditions, Plaintiffs argue, cannot be adequately compensated with money damages.   But this argument misstates the relevant inquiry.   A plaintiff is not entitled to a preliminary injunction simply because the plaintiff will likely suffer what, in everyday speech, might be called a "harm" or an "injury." Unquestionably, any plan that forces children to change schools may

be traumatic for children and parents alike.  And, undoubtedly, the Consolidation Plan may "harm" some children within the plain English meaning of the word.  But this Court cannot enjoin conduct unless that harm is a "cognizable injury" that the law protects against, such as a violation of a plaintiff's First or Fourteenth Amendment rights.  See, generally, SG Cowen Sec. Corp. v. Messih, No. 00-CV-3228, 2000 WL 633434, *6 (S.D.N.Y. May 17, 2000) (denying employer's motion for a preliminary injunction to stop former employee's competition against it, because "employers have no legitimate interests in preventing employees from competing for the patronage of clients they have acquired independently").  Thus, this Court cannot award Plaintiffs any injunctive relief absent a showing of legal injury.

Next, Plaintiffs do attempt to demonstrate, at least rhetorically, some violation of their First and Fourteenth Amendment rights.  But this argument depends on the same frivolous claims addressed above, such as that: (1) Defendants' plan to reduce spending and cut taxes in a totally religiously neutral fashion discriminates against Lawrence's non-Orthodox population; and (2) lower taxes somehow create an impermissible subsidy to yeshivas, because some people might use the money they save on taxes to help afford yeshiva tuition.  See Pl. Br. at 32 (arguing that "the Consolidation Plan" was "motivated" by a desire to "divert public monies to Orthodox interests, particularly

31

yeshivas"). And, consequently, Plaintiffs' irreparable injury argument is also frivolous.

Lastly, Plaintiffs argue that the mere <u>claim</u> that a government policy violates the First Amendment suffices to establish a "presumption" of irreparable harm. <u>See</u> Pl. Br. at 3-6; Pl. Reply Br. at 2-3. But most of the cases that Plaintiffs cite stand only for the unremarkable proposition that a <u>violation</u> (not a <u>claimed</u> violation) of the First Amendment is an irreparable injury. <u>See</u>, <u>e.g.</u>, <u>Fifth Avenue Presbyterian Church v. City of New York</u>, 293 F.3d 570, 574 (2d Cir. 2002); <u>Paulson v. County of Nassau</u>, 925 F.2d 65, 68 (2d Cir. 1991). Here, as noted throughout this opinion, Plaintiffs' allegations – even if true – do not amount to any First Amendment violations.

Plaintiffs also cite <u>Chapliancy of Full Gospel Churches v. England</u>, 454 F.3d 290, 303 (D.C. Cir. 2006). There, the D.C. Circuit held that "where a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong." <u>Id.</u> But it is unclear whether even <u>Chapliancy</u> extends as far as Plaintiffs believe. And, if <u>Chaplinacy</u> does extend this far, the Court respectfully disagrees with it.

<u>Chapliancy</u> based its holding on an understanding that, for purposes of the irreparable harm prong, courts must assume "that the non-movant's conduct violates the law" and thus need only

look at "whether that violation, if true, inflicts irremediable injury." Id. Although its language is unclear, Chapliancy's reference to "if true" suggests that courts should employ something akin to a Rule 12(b)(6) standard in adjudicating the irreparable harm prong. In short, this Court reads Chapliancy as directing courts to assume that Plaintiffs' factual allegations are true, and then consider whether those factual allegations suffice to show irreparable injury. The Court does not believe that the D.C. Circuit, in issuing Chapliancy, intended for district courts to assume that a movant's conclusory allegations are true, and thereby automatically find irreparable harm regardless of how far-fetched or preposterous a movant's asserted First Amendment violation is. But even if Chapliancy does so hold, it is not binding upon this Court. And this Court does not believe that the Second Circuit would hold that "irreparable harm" exists even when Plaintiffs fail to properly plead a First Amendment violation, and thus, fail to plead an irreparable injury.

Here, as discussed below, Plaintiffs have failed to plead any actionable First Amendment violation, much less "demonstrate . . . the likelihood of irreparable injury." Zino Davidoff SA, 571 F.3d at 242. Accordingly, they are not entitled to any presumption of irreparable harm.

II.  <u>DEFENDANTS' MOTION TO DISMISS IS GRANTED IN FULL</u>

    A. <u>Standard of Review Under Rule 12(b)(6)</u>

        To withstand a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim for relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (reversing the Second Circuit's decision in <u>Iqbal v. Hasty</u>, 490 F.3d 143 (2d Cir. 2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>  Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  <u>Id.</u> (internal citations and quotations omitted).  Examining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 1950.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint fails to state a claim.  <u>Id.</u>  The plaintiff's factual allegations, in short, must

show that the plaintiff's claim is "plausible," not merely "conceivable."  <u>Id.</u> at 1951.

In applying the plausibility standard set forth in <u>Twombly</u> and <u>Iqbal</u>, a court "assume[s] the veracity" only of "well-pleaded factual allegations," and draws all reasonable inferences from such allegations in the plaintiff's favor.  <u>Id.</u> at 1950. Pleadings that "are no more than conclusions," however, "are not entitled to the assumption of truth."  <u>Id.</u>

B.  <u>Plaintiffs fail to State a Claim</u>

Plaintiffs' Complaint seeks relief under 42 U.S.C. § 1983 for alleged violations of Plaintiffs' First and Fourteenth Amendment Rights, and conspired to do so in violation of 42 U.S.C. §§ 1985, 1986.

Nothing Plaintiffs have pled remotely resembles any violations of the First or Fourteenth Amendment – except, ironically, for Plaintiffs' requested relief, which itself violates the First and Fourteenth Amendments.  Principally, Plaintiffs allege that the Consolidation Plan violates the First and Fourteenth Amendments.  But, as discussed at length above, the Consolidation Plan has an indisputable secular purpose (reducing spending and lowering taxes), has no "principal or primary effect" that endorses Orthodox Judaism, does not remotely entangle state and religion, and does not discriminate on the basis of religion. In this regard, it is irrelevant that some Lawrence residents want

reduced school spending because they send their children to parochial schools and don't directly benefit from the public schools. <u>See</u> <u>supra</u> at 5-6. It is irrelevant that some Lawrence residents want lower taxes so that they can more easily afford parochial school tuition. <u>See</u> <u>supra</u> at 6-7. It is irrelevant that some Orthodox Rabbis called upon their followers to vote in a School Board election, and that Lawrence's Orthodox Jewish community repeatedly mobilized to fight for lower government spending and reduced taxes. <u>See</u> <u>supra</u> at 5-7, 25-26. It is irrelevant that these political efforts succeeded in electing School Board members who, Plaintiffs' allege, favor the interests of taxpayers over school students, and thus passed the Consolidation Plan despite its alleged lack of educational merit. <u>See</u> <u>supra</u> at 7, 11-13. It is irrelevant that a single child expressed "hatred" at what she perceives is a School Board dominated by "Jewish" members. <u>See</u> <u>supra</u> at 22. And it is irrelevant that most Orthodox Jews in Lawrence allegedly favor the Consolidation Plan, while most other residents allegedly do not. <u>See</u> <u>supra</u> at 27-29. Accepting all Plaintiffs' facts as true, all Plaintiffs have pled is that – through the normal democratic process – an anti-tax, anti-spending majority gained control of Lawrence's School Board, and passed a plan to reduce spending and taxes that Plaintiffs disagree with. This is not a First or Fourteenth Amendment violation. Plaintiffs requested remedy,

however, certainly is – as it would have the Court enjoin the Consolidation Plan simply because most of its proponents are Orthodox Jews or some of the resulting tax reductions may help Lawrence residents finance yeshiva education.

Plaintiffs also make a few other allegations, aside from the Consolidation Plan. But none of them state an actionable claim. For instance, Plaintiffs allege that Defendants ultimately seek to sell or lease School Number 6 to a yeshiva, and that much "preparatory" work has already been done to facilitate such sale. Compl. ¶ 109; Pl. Reply Br. at 4. But, whatever Defendants' ultimate intentions, no sale or lease plan is presently pending. Thus, to the extent that Plaintiffs allege that Lawrence seeks to impermissibly aid Orthodox Judaism by selling or leasing the school to a yeshiva, this claim is not ripe. And, even if such a plan does come to fruition, there would be no constitutional infirmity provided that the yeshiva pays a fair market price for the school. See, generally, Southside Fair Housing Comm. v. City of New York, 928 F.2d 1336 (2d Cir. 1991) (permitting the sale of government land to a religious organization that sought to build a yeshiva). Plaintiffs also allege that the School Board implemented a Constitutionally objectionable busing scheme. But any dispute concerning this scheme is now moot, because New York's state courts have already overturned it. Compl. ¶ 79.

The Kulanu issue mentioned in the Complaint is slightly

37

more complicated.  Plaintiffs plead certain facts surrounding this issue which might, arguably, raise Constitutional concerns.  Compl. ¶¶ 88-97.  But Plaintiffs' Complaint never expressly asserts claims concerning the Kulanu subsidies.  And, in their reply brief, Plaintiffs clarify that they "merely use the 'Kulanu' issue" to provide "context" for their claims concerning the Consolidation Plan.  Thus, by their own admission, Plaintiffs' allegations concerning Kulanu were not intended as the basis for an actionable claim.

Thus, in addition to not being entitled to a preliminary injunction, Plaintiffs have failed to even state a claim.

<u>CONCLUSION</u>

Plaintiffs' motion for a preliminary injunction is DENIED.  Plaintiffs' Complaint is DISMISSED.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          August  24  , 2009

38