UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
TARA INCANTALUPO, STEPHEN JACKSON,
ANDREW LEVEY, STACEY SULLIVAN, and
FU-YUN TANG,

                    Plaintiffs,                    MEMORANDUM AND DECISION
        -against-                                  09-CV-3342 (JS)(AKT)

LAWRENCE UNION FREE SCHOOL DISTRICT
NUMBER 15, ET AL.,

                    Defendants.
----------------------------------X
APPEARANCES:
For Plaintiffs:          Rick Ostrove, Esq.
                         Leeds Morelli & Brown
                         One Old Country Road, Suite 347
                         Carle Place, NY 11514

For Robert M. Agostisi:  John S. Ciulla, Esq.
                         Rosenberg Calica & Birney LLP
                         100 Garden City Plaza, Suite 408
                         Garden City, NY 11530

For Defendants:          Brian S. Sokoloff, Esq.
                         Steven C. Stern
                         Sokoloff Stern LLP
                         355 Post Avenue, Suite 201
                         Westbury, NY 11501

                         David J. Butler, Esq.
                         Bingham McCutchen LLP
                         2020 K Street, NW
                         Washington, DC 20006

                         Roslyn Z. Roth, Esq.
                         9 Troy Place
                         Merrick, NY 11566

Amicus Curie:            New York Civil Liberties Union Foundation
                         E. Christopher Murray, Esq.
                         Reisman, Peirez & Reisman, L.L.P.
                         1305 Franklin Avenue
                         PO Box 119
                         Garden City, NY 11530

SEYBERT, District Judge:

Pending before the Court is Defendants' motion for attorneys' fees and costs against Plaintiffs (under 42 U.S.C. § 1988) and Plaintiffs' former counsel Robert M. Agostisi, Esq. (under 28 U.S.C. § 1927). For the foregoing reasons, Defendants' motion is GRANTED IN PART DENIED IN PART. The Court awards Defendants $5,000, to be assessed equally against Plaintiffs and Mr. Agostisi.

<u>BACKGROUND</u>

On August 4, 2009, Plaintiffs sued the Board of Education of the Lawrence Union Free School District ("the School Board"), the Lawrence Union Free School District Number 15, (collectively, "the Lawrence Defendants"), and various current and former members of the School Board (collectively, "the Individual Defendants"), alleging that Defendants' plan to close a Lawrence school and use the money to cut taxes ("the Consolidation Plan") somehow turned the School Board "into an Orthodox [Jewish] ruling committee" and "establish[ed] Orthodox Judaism as the official religion" of Lawrence. Compl. ¶ 98. Along with filing their Complaint, Plaintiffs also moved for a temporary restraining order and a preliminary injunction against the Consolidation Plan. The Court immediately denied Plaintiffs' request for a temporary restraining order. Then, on August 24, 2009, the Court denied Plaintiffs' request for a preliminary injunction and dismissed Plaintiffs' Complaint as frivolous. See <u>Incantalupo v. Lawrence</u>, 652 F. Supp.

2d 314 (E.D.N.Y. 2009).

Specifically, the Court found that Plaintiffs failed to plead a First or Fourteenth Amendment violation because, based on Plaintiffs' own pleadings, "the Consolidation Plan has an indisputable secular purpose (reducing spending and lowering taxes), has no 'principal or primary effect' that endorses Orthodox Judaism, does not remotely entangle state and religion, and does not discriminate on the basis of religion." <u>Id.</u> at 331. On the contrary, the Court noted that "Plaintiffs' Complaint, on its clear face, seeks to <u>create</u>, not cure, First Amendment and Equal Protection violations" because it seeks to "deny Orthodox Jews political rights possessed by every other group in the United States: the right to mobilize in support of religiously neutral government policies, and then have those policies enacted through normal democratic processes." <u>Id.</u> at 324. Indeed, the Court commented that, because "lower taxes and school spending are not unconstitutional by themselves," the Plaintiffs effectively ask the "Court to discriminate against Orthodox Jews" by finding that Lawrence cannot enact "religiously neutral government actions" that are "motivated by the Jewish faith, instead of anti-tax sentiment generally." <u>Id.</u> at 325.

On September 2, 2009, Defendants filed this motion. On September 22, 2009, Plaintiffs appealed the Court's decision denying

a preliminary injunction and dismissing this case.  On June 7, 2010, the Second Circuit denied Plaintiffs' appeal ("Slip Op.").  <u>See</u> __ Fed. Appx. __, 2010 U.S. App. LEXIS 11577.

DISCUSSION

I.    <u>42 U.S.C. § 1988 Motion</u>

"In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.  A defendant is a "prevailing party" if the plaintiff's claim "was frivolous, unreasonable, or groundless" or "the plaintiff continued to litigate after it clearly became so." <u>Panetta v. Crowley</u>, 460 F.3d 388, 399 (2d Cir. 2006) (quoting <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 422, 98 S. Ct. 694, 54 L. Ed. 2d 648 (1978)).  The defendant "need not show bad faith by a plaintiff to be entitled to attorneys' fees," but "such a showing provides 'an even stronger basis' for the award." <u>Id.</u>

Here, Defendants seek attorneys' fees based principally on the grounds that Plaintiffs' Complaint was frivolous.  In addition, Defendants ask the Court to sanction Plaintiffs for the "stereotypical and harassing" allegations that Plaintiffs included in their Complaint, which Defendants contend "cast the Lawrence area Orthodox Community as a community of aliens, separate and apart from

4

broader society." Def. Br. at 5. In opposing Defendants' attorneys' fees motion, Plaintiffs raise numerous arguments. Roughly speaking, these arguments can be grouped into roughly three categories: (1) the Complaint is not frivolous because it pled "plausible" factual allegations; (2) the Complaint's legal theories are not frivolous; and (3) the Complaint's allegations about Orthodox Jewish practices served a valid purpose, and were neither stereotypical nor harassing. The Court addresses each of these arguments in turn.

A. The Factual "Plausibility" Of Plaintiffs' Allegations Is Irrelevant

First, Plaintiffs argue that their claims are not frivolous because their factual contentions, such as Orthodox Jews favoring lower taxes and public school spending and voting as a bloc to support these goals, are "plausible." Pl. Opp. Br. at 9-12. But Plaintiffs misstate the inquiry. The issue is <u>not</u> whether Plaintiffs' factual contentions are "plausible." It is whether those contentions, if true, state Constitutional violations.[1] Manifestly, they do not. Contrary to Plaintiffs' belief, there is nothing unconstitutional about Orthodox Jews favoring lower taxes instead of higher government spending on public schools. And bloc

_____

[1] The Court notes that the Second Circuit "identif[ied] no merit in plaintiffs' contention that the district court misapplied this plausibility standard." 2010 U.S. App. LEXIS 11577 at *3.

voting, far from being a Constitutional violation, is a protected Constitutional right.

For this reason, Plaintiffs' reliance on the CURE Study is irrelevant. Indeed, if anything, the CURE Study evidences how frivolous Plaintiffs' arguments are. For instance, Plaintiffs appear to use the CURE Study to support their conclusory allegation that cutting (or not raising) taxes somehow "divert[s]" or "funnel[s]" "public money to private religious causes." Compl. ¶¶ 86, 108-11; Pl. Opp. Br. 11. But, while it is true that the CURE Study uses the term "siphoning" to describe Lawrence's budget practices, it does not do so in the context of tax cuts. (p. 18). Instead, the CURE Study uses the phrase to criticize Lawrence for spending money on services for private school students (such as busing, textbooks and special education); expenditures that the CURE Study acknowledges are not only legal, but required under New York law. (pp. 33, 36). It is accurate, if pejorative, to describe such spending as the "siphoning" or "diverting" of public money to private schools. It is wholly inaccurate to use that same terminology to describe tax cuts. Contrary to Plaintiffs' apparent belief, Lawrence's School Board does not have a claim to every dollar Lawrence residents might earn in the future. Money that taxpayers have not yet earned, much less paid in taxes, is not "public money" that can be "diverted." It is money that can become either public or private,

depending on the choices Lawrence's citizens make through their elected representatives.

## B. Plaintiffs' Legal Theories Were Frivolous

### 1. The Lemon Test's "Secular Purpose" Prong

In opposing Defendants' attorneys' fees motion Plaintiffs argue that the Complaint pled sufficient factual allegations to show that the Consolidation Plan's professed secular purpose (cutting taxes and reducing spending) was a sham. Specifically, Plaintiffs argue that they properly alleged a sham because: (1) Lawrence residents had long complained about the School Board's "Orthodox Majority" making decisions to benefit yeshiva students over public school students; (2) local rabbis supported the School Board Members' election campaigns, and backed their proposals to improve special education services for yeshiva students; and (3) Defendant Uri Kaufman referenced benefits the Board had provided to "frum" (i.e., Orthodox Jewish) families. Plaintiffs argue that these allegations, taken collectively and in "context,"[2] demonstrate that the Consolidation Plan's true purpose was helping families afford yeshiva tuition.

As an initial matter, the Court notes that Plaintiffs never made this argument prior to the Court dismissing their case.

---

[2] Plaintiffs' extensive arguments regarding the Court's supposed failure to consider the Consolidation Plan's factual "context" relate to this prong. Opp. Br. at 20-23, 33-35.

Plaintiffs' Complaint and preliminary injunction briefing do not mention the word "sham." And Plaintiffs used the phrase "secular purpose" only once in each brief, when they formulaically recited the Lemon test's three prongs. Indeed, Plaintiffs briefed only the Lemon test's last two prongs and expressly declined to address the "secular purpose" prong. Pl. Br. at 9 ("plaintiffs shall demonstrate, below, that the Consolidation Plan cannot withstand scrutiny under the second and/or third prongs of the Lemon test"). Thus, prior to the Court dismissing their Complaint, Plaintiffs did not dispute that the Consolidation Plan served the valid secular purposes of cutting taxes and reducing spending. And the Court, obviously, must address the Complaint as actually pled and Plaintiffs' arguments as actually made. Plaintiffs cannot contest their Complaint's frivolous nature by retroactively inserting pleadings never pled and arguments never raised.

But even if Plaintiffs had argued the Lemon test's secular purpose prong, any such argument would have been frivolous. Essentially, Plaintiffs contend that saving money and cutting taxes are not valid secular purposes because the School Board was motivated, in large part, by the religious desire to help Orthodox Jewish families afford yeshiva tuition. But, under Lemon, "what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law." Board

8

of Educ. of Westside Cmty. Schs. v. Mergens By and Through
Mergens, 496 U.S. 226, 249, 110 S. Ct. 2356, 110 L. Ed. 2d 191 (1990);
Slip Op., 2010 U.S. App. LEXIS 11577 at *4 (quoting Board of Educ.
of Westside Cmty. Schs.). This distinction between "motives" and
"purpose" is crucial, because religious motives often serve
legitimate secular purposes. See, generally, School Dist. of
Abington Tp., Pa. v. Schempp, 374 U.S. 203, 306, 83 S. Ct. 1560, 10
L. Ed. 2d 844 (1963) (Goldberg, J., concurring) ("many of our legal,
political and personal values derive historically from religious
teachings"). Thus, for example, a judge might believe that God
forbids taking bribes. See, generally, Deuteronomy 16:18-20. But
this does not, however, make a judge's refusal to accept bribes
unconstitutional, because judicial honesty serves the legitimate
secular purpose of fairly administering justice. Rather, for First
Amendment purposes, what matters is whether the public act treats
secular and religious conduct equally, and does not favor one
religion over another. Board of Educ. of Westside Community
Schools, 496 U.S. at 249 ("Because the Act on its face grants equal
access to both secular and religious speech, we think it clear that
the Act's purpose was not to endorse or disapprove of religion.")
(internal citations and quotations omitted). Here, Plaintiffs'
Complaint does not plead, and Plaintiffs' briefs do not argue, that
the Consolidation Plan's combination of tax and spending cuts favors

yeshiva or religious education over secular pursuits.  For instance,
Plaintiffs did not allege that Defendants planned to use the money
saved to fund vouchers, much less vouchers redeemable only at
yeshivot.  Instead, Plaintiffs <u>pled</u> that Defendants intended to use
the Consolidation Plan's savings in a religiously-neutral way: "to
fund a flat tax and/or tax rebates, <u>just as [they] did with the sale</u>
<u>proceeds of School Number 1</u>."  Compl. ¶ 108 (emphasis supplied).
Accordingly, regardless of the legislators' alleged "motives,"
Plaintiffs pled that Defendants enacted the Consolidation Plan to
raise money to fund generally applicable lower taxes.  And lower
taxes do not have the "purpose" of advancing Orthodox Judaism.  They
have the "purpose" of reducing government and enabling taxpayers to
spend their money as they wish – whether for yeshiva tuition, Catholic
Sunday school, nicer vacations, or one of a thousand other religious
or secular uses.  <u>See</u> Slip Op., 2010 U.S. App. LEXIS 11577 at *4
("Determining the appropriate level of tax support for government
services is a longstanding secular purpose of government.").

        More to the point, Plaintiffs' new fangled "secular
purpose" argument is, itself, borderline sanctionable.  Among other
things, Plaintiffs contend that the Consolidation Plan's professed
secular purpose is a "sham" because "local rabbis supported the
campaign to elect a majority of Orthodox Board members."  Pl. Opp.
Br. at 13-14.  Plaintiffs, however, present no legal authority or

foundation to suggest that the Court can nullify legislation based on the political endorsements of private citizens.  See, generally, Newdow v. Rio Linda Union School Dist., 597 F.3d 1007, 1032 n. 27 (9th Cir. 2010).  And the Court finds such an argument to be frivolous. See, generally, Adamsons v. Wharton, 771 F.2d 41, 43 (2d Cir. 1985) (imposing sanctions for raising frivolous constitutional claims). For, troublingly, this argument again asks the Court to adopt a position that would "severely chill clergy members' free speech and petition rights -- as they would fear rendering otherwise constitutionally unobjectionable legislation impermissible through their support."  Incantalupo, 652 F. Supp. 2d at 327; see, generally, Slip Op., 2010 U.S. App. LEXIS 11577 at *4 ("the First Amendment does not exclude any interest from public debate simply because it is informed by religion").

     2.   The Lemon Test's Principal Effect Prong[3]

Plaintiffs also argue that their Complaint adequately showed that the Consolidation Plan had the principal effect of "advanc[ing]" Orthodox Judaism.  In this regard, Plaintiffs argue

---

[3] Within this prong, Plaintiffs contest the Court's finding that their factual allegation about Lawrence's intent to sell the Number 6 School to a yeshiva was not ripe.  The Court disagrees with Plaintiffs' arguments, and notes that the Second Circuit upheld the Court's conclusion that this claim was not yet ripe.  See Slip Op., 2010 U.S. App. LEXIS 11577 at *2 n. 1.  Nevertheless, the Court finds nothing frivolous or sanctionable with respect to this particular claim or argument.

that, although the Consolidation Plan's tax benefits applied equally to all Lawrence residents, the Plan caused "the depletion of services to the public school children, who are mostly non-Orthodox."  Opp. Br. at 23.  Thus, Plaintiffs argue, the Consolidation Plan "advance[d]" Orthodox Judaism by disparately impacting non-Orthodox children.  Id.

This argument is frivolous.  Lemon's second prong concerns a statute's principal effect, not whether it impacts every religious group equally.  See Hernandez v. C.I.R., 819 F.2d 1212, 1219 (1st Cir. 1987) (rejecting an Establishment Clause challenge predicated on an alleged disparate impact).  Indeed, there is "no disparate-impact theory in First Amendment law."  Terry v. Reno, 101 F. 3d 1412, 1419-20 (D.C. Cir. 1996); U.S. v. Dinwiddie, 76 F.3d 913, 923 (8th Cir. 1996); see also McTernan v. City of York, Pa., 564 F.3d 636, 653 n.10 (3d Cir. 2009) (citing Dinwiddie).[4]

---

[4] In this regard, Plaintiffs' reliance on the Kiryas Joel school district cases is highly misplaced.  In the Kiryas Joel cases, New York enacted legislation to create a school district "consciously drawn" to "secure for one religious community a unique and significant benefit-a 'public school' where all the students adhere to the tenets of a particular religion." Grumet v. Pataki, 93 N.Y.2d 677, 690, 720 N.E.2d 66, 72 (N.Y. 1999); Board of Educ. of Kiryas Joel Vill. School Dist. v. Grumet, 512 U.S. 687, 708, 114 S. Ct. 2481, 129 L. Ed. 2d 546 (1994) (statute unconstitutional because  New York "purposely dr[ew]" the district's lines "to separate Satmars from non-Satmars").  Here, the Consolidation Plan does not provide any "unique" or "particular" benefits to Orthodox Jews.  It closes School Number 6 to all children, and cuts taxes for all taxpayers.

Plaintiffs also argue that the Consolidation Program's tax cuts are not a "program of true private choice" because, when "combined with a devaluation of the public school option," the Plan "provided an incentive to send kids to private schools."  Pl. Opp. Br. at 24-25.  In this regard, Plaintiffs attempt to distinguish Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002), on the grounds that the school voucher program in Zelman did not involve less spending on public schools. Plaintiffs' argument is nonsense.  See Slip Op., 2010 U.S. App. LEXIS 11577 at *6 ("[t]he circumstances of this case are, in fact, most closely analogous to those in Zelman").  In Zelman, the Supreme Court upheld a voucher program targeted at private schools, because, as "a program of true private choice," the vouchers were "neutral in all respects towards religion," even though most of the area's private schools were religious.  Id., 536 U.S. at 653.[5]  Here, the

_____

[5] Plaintiffs' reliance on Committee for Pub. Educ. & Rel. Liberty v. Nyquist, 413 U.S. 756, 758, 93 S. Ct. 2955, 37 L. Ed. 2d 948 (1973) and Winn v. Arizona Christian School Tuition Org., 586 F.3d 649, 651 (9th Cir.) is also seriously misplaced.  In both Nyquist and Winn, the programs at issue provided benefits to taxpayers for supporting private schools (tuition deductions in Nyquist, tax credits for donations in Winn), and the Nyquist program also directly subsidized private schools.  In contrast, the Consolidation Plan neither provides money to private schools, nor any kind of tax benefit connected to supporting private schools.  Furthermore, it should be noted that, in Winn, eight 9th Circuit judges dissented from the denial of rehearing en banc, and the Supreme Court has recently granted certiorari.  See __ S. Ct. __, 2010 WL 621396.

Consolidation Plan does not target private schools.  It simply lets taxpayers use "true private choice" by not forcing them to send as much money to the government.  Id.; Slip Op., 2010 U.S. App. LEXIS 11577 at *5 (finding that the Consolidation Plan "is neutral as among taxpayers of different or no religious beliefs" and "does nothing to reward or even encourage" religious education).  Furthermore, reducing spending on public schools does not "incentiv[ize]" private schools, much less yeshivot or religious schools in particular.  At most, it reduces the "incentive" for parents to send their children to public schools, by cutting the taxpayer subsidy.

Indeed, if the Court accepted Plaintiffs' "principal effect" theory, the Court's decision would, ironically, have the "principal effect" of reducing Lawrence's Orthodox Jewish population into little more than tax-paying serfs: forced to accommodate the non-Orthodox population's desire for increased taxes, but stripped of the ability to organize in favor of more limited government or to exercise any meaningful say in how Lawrence spends their tax money.[6]

---

[6] To that end, the Court notes that Plaintiffs do not only object to Defendants' efforts to reduce spending.  They also object to Defendants' previous attempts to increase public support for various private school services.  Compl. ¶¶ 49, 59, 74.  And they do so despite relying on the CURE Study, which reports that New York law requires much of that spending.  CURE Study p. 33 (noting that New York law requires school districts "to pay for certain services/supplies for private school students," including

14

### 3. Endorsement Of Religion

Plaintiffs further argue that their Complaint sufficiently pled that the Consolidation Plan endorsed Orthodox Judaism. In this regard, Plaintiffs argue that: (1) the Court erred in considering the letters Lawrence residents wrote opposing the Consolidation Plan; and (2) the Consolidation Plan's factual context demonstrates that a reasonable observer would view the Consolidation Plan as endorsing Orthodox Judaism. Both these arguments are groundless.

First, contrary to Plaintiffs' claims, the Court did <u>not</u> consider the letters it received when considering Defendants' request to dismiss. Instead, it considered these letters in the context of Plaintiffs' motion for a preliminary injunction. <u>See</u> <u>Incantalupo</u>, 652 F. Supp. 2d at 326. And it properly did so, because, for preliminary injunction purposes, the Court had to consider whether Plaintiffs showed either a likelihood of success on the merits, or sufficiently serious questions going to the merits. <u>Id.</u> at 322.

Second, Plaintiffs also argue that, although a reasonable observer might consider the Consolidation Plan to be religiously

---

"transportation to private schools within 15 miles; textbooks; special education services; and other supplemental services provided in public schools by nurses, social workers, and school psychologists").

neutral when "[v]iewed in isolation," the observer would consider the Plan to endorse religion once aware of the Plan's factual context, such as "the Board's previous efforts to benefit the parents of private sectarian schools." In effect then, Plaintiffs argue that the "reasonable observer" standard enables litigants to tarnish, through guilt by association, unobjectionable and religiously neutral government actions. This is not the law. See Slip Op., 2010 U.S. App. LEXIS 11577 at *5-6 n. 3 ("Background often provides relevant context for challenged conduct. But where, as here, the conduct at issue involves a reduction in public spending that results in a general savings to taxpayers, the cited background evidence is insufficient to cast neutral government action as an establishment of religion."). The endorsement inquiry, including the reasonable observer standard, applies only if the challenged act concerns "expression by the government itself" or "government action alleged to discriminate in favor of private religious expression or activity." Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 764, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995); see also Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 34-35, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004) (O'Connor, J., concurring) (reasonable observer inquiry applies to "those situations in which government makes adherence to a religion relevant"); Good News Club v. Milford Cen. School, 533 U.S. 98, 113-114, 121 S. Ct. 2093, 150

L. Ed. 2d 151 (2001) (rejecting argument that community would perceive operation of a Christian club in an elementary school to endorse religion; school provided the same benefits to non-religious organizations, and "neutrality" towards religion is not endorsement). Here, the Consolidation Plan did not concern "expression by the government itself," nor did it "discriminate" in favor of religion. It closed School Number 6 for all students, regardless of faith. And it funded lower taxes for all taxpayers, without regard to religious belief, identification, or practice. So, the "reasonable observer" test cannot save Plaintiffs' Complaint from frivolousness.[7]

4. <u>Entanglement</u>

Plaintiffs further contend that their Complaint was not frivolous because the Consolidation Plan was "excessively entangle[d]" with Orthodox Judaism. In support, Plaintiffs contend that, because they alleged that Lawrence had "political division along religious lines," it was not frivolous to suggest that the Consolidation Plan violated the First Amendment.

The Court disagrees. It is well-established that "political divisiveness alone" cannot "invalidate otherwise permissible conduct." <u>Lynch v. Donnelly</u>, 465 U.S. 668, 684, 104 S.

---

[7] The Court's opinion denying a preliminary injunction and dismissing Plaintiffs' Complaint discussed the "reasonable observer" standard only for the sake of argument.

Ct. 1355 (1984) (because policy "does not involve a direct subsidy" to religion, "no inquiry into potential political divisiveness is even called for"); see also Board of Educ. of Kiryas Joel Village School Dist., 512 U.S. at 708 (no Constitutional problem with a "religiously homogeneous group . . . exercising political power conferred on it without regard to religion"). Indeed, the Second Circuit has expressly held that political divisiveness matters only when a public policy "involve[s] a 'direct subsidy' to religious institutions." Southside Fair Housing Committee v. City of New York, 928 F.2d 1336, 1351 (2d Cir. 1991); McCreary v. Stone, 739 F.2d 716, 726 (2d Cir. 1984) (interpreting Lynch as "limit[ing] the potential political divisiveness part of the excessive entanglement prong to cases involving direct subsidies to church-sponsored schools, colleges or other religious institutions"), aff'd at 471 U.S. 83, 105 S. Ct. 1859, 85 L. Ed. 2d 63 (1985); see also Slip Op., 2010 U.S. App. LEXIS 11577 at *5 (entanglement inquiry relevant "when state monitors religious institution, cedes government authority to sectarian group, or takes sides in religious dispute") (citing Skoros v. City of New York, 437 F.3d 36, 36-38 (2d Cir. 2006)). Plaintiffs' "political divisiveness" argument directly ignores this binding precedent, and thus is not warranted by existing law. And, by ignoring the relevant, binding authority, Plaintiffs present no argument for extending, modifying, or reversing existing law.

18

Accordingly, this argument, like Plaintiffs' Complaint in its entirety, is frivolous.

### 5. Equal Protection[8]

Finally, Plaintiffs argue that their Complaint was not sanctionable because it pled a non-frivolous Equal Protection claim.

Prior to the Court's dismissal, Plaintiffs contended that they set forth a cognizable Equal Protection claim because they sufficiently pled: (1) selective treatment; and (2) discriminatory animus. <u>See</u> Pl. Prelim. Injunct. Br. at 31-33 (citing <u>Quinn v. Nassau</u>, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999). These arguments were frivolous. With respect to Plaintiffs' "selective treatment" argument, the Consolidation Plan did not treat Orthodox Jews differently from other residents: it closed School Number 6 for all students and cut taxes for all taxpayers. <u>See</u> Slip Op., 2010 U.S. App. LEXIS 11577 at *7 (rejecting selective treatment claim because, "[o]n plaintiffs' own version of the facts, the challenged consolidation plan applies equally to similarly situated individuals without regard to their religious affiliation"). And Plaintiffs' discriminatory animus arguments were similarly spurious. According

---

[8] For purposes of judicial economy, the Court rejected Plaintiffs' Equal Protection claim on the simplest ground: it failed to properly allege a suspect class. <u>Incantalupo</u>, 652 F. Supp. 2d at 328-29. The Court did not, however, find that Plaintiffs' "suspect class" claims were frivolous. Rather, as discussed in this opinion, Plaintiffs' Equal Protection claim is frivolous on other grounds.

to Plaintiffs, the Defendants' discriminatory animus was "best illustrated through the campaign platforms, and other rhetoric." Id. at 32 (citing Agostisi Decl. Exs. 7, 8, 23, 27). But these documents reflect no such animus. Exhibit 7 is a Newsday article about the Lawrence school budget. At its most damning, it quotes Defendant Murray Forman as saying, "We were elected to regain the confidence of this community, not to try to get regulations waived when the voters have spoken." Exhibit 8 is a letter signed by several rabbis urging their followers to vote in the upcoming school board elections. Even if this letter reflected animus towards Lawrence's non-Orthodox population (it does not), Plaintiffs pled no facts indicating that the rabbis' supposed animus should be imputed to Lawrence or the Individual Defendants. Nor is the Court aware of any legal authority that permits a third party's alleged bias to be imputed to a defendant, simply because they share the same religious faith. Exhibit 23 is a short article reporting that six of the School Board members are Orthodox Jews. The article says nothing indicating that any of these persons harbor animus towards followers of other faiths. Finally, Exhibit 27 is another news article. This article suggests that some Lawrence residents might dislike Orthodox Jews. Ex. 27 (quoting one student as saying that the Board is "all Jewish and there's a lot of hatred against them"). But it says nothing about whether Lawrence or the Individual Defendants have

discriminatory intent towards Lawrence's non-Orthodox population.

Indeed, the only Individual Defendant referenced is Uri Kaufman, whom the article quotes for the unobjectionable proposition that voters should "judge me on my record and the record of the board." So, by Plaintiffs' own admission, their Equal Protection claim's strength was "best illustrated" by documents that, in actuality, suggest no discriminatory animus or intent at all (except, perhaps, animus against Orthodox Jews by some members of Lawrence's non-Orthodox population). And, accordingly, Plaintiffs' Equal Protection argument was patently frivolous.

Furthermore, Plaintiffs' Complaint was no better than their professed "best illustrat[ions]." At most, the Complaint alleged that Defendant Uri Kaufman made condescending remarks about "public school parents." Compl. ¶¶ 67-68.[9] But even if the Court could somehow infer, from a comment about "public school parents," that Mr. Kaufman harbored animus towards non-Orthodox Jews, the Court could not impute his alleged bias to the other Individual Defendants, much less Lawrence itself. More to the point, the Complaint itself

_____

[9] The Complaint also alleges, in conclusory fashion, that Defendant Asher Mansdorf "issued a veiled threat to the non-Orthodox population." Compl. ¶ 69. But Plaintiffs pled no facts to suggest that Mr. Mansdorf did anything of the sort. Instead, Plaintiffs appear to base this allegation on Mr. Mansdorf's statement that Lawrence would have to make "difficult choices" in school funding. Id. Making "difficult choices" is, of course, what any policy maker does.

alleged that the Defendants enacted the Consolidation Plan for a legitimate, non-discriminatory reason: raising money to fund the lower taxes they promised voters. Compl. ¶¶ 59, 61, 108. And, in so doing, the Complaint refuted any suggestion of an Equal Protection violation. See Hicks v. IBM, 44 F. Supp. 2d 593, 598 (S.D.N.Y. 1999) ("a complaint that identifies other possible motives, combined with a lack of specific factual support of racial animus, contradicts a claim of racial discrimination"); Colliton v. Cravath, Swaine & Moore LLP, 08-CV-0400, 2008 WL 4386764, *13 (S.D.N.Y. 2008) (imposing sanctions for "amended complaint consisting of self-contradictory allegations").[10]

In opposing Defendants' attorneys' fees motion, Plaintiffs largely abandon their prior theories. Instead, Plaintiffs now contend that the Consolidation Plan "relegate[s]" "non-white" students to "more crowded schools and reduced services" while "services and support for private religious schools consume an ever-increasing share of the shrinking school district budget." Pl. Opp. Br. at 36. And Plaintiffs further contend that non-Orthodox students were similarly disadvantaged. But this new argument is just as frivolous, for two reasons. First, as Plaintiffs concede, they did not plead a racial discrimination claim. Pl. Opp. Br. at

---

[10] Indeed, the suggestion that Defendant David Sussman harbors animus towards Lawrence's non-Orthodox population is particularly curious, as Mr. Sussman is not an Orthodox Jew. Compl. ¶ 101.

37, Compl. ¶¶ 147-149, 152-153. So this non-existent claim cannot save them from sanctions. And second, Plaintiffs' new religious discrimination argument depends upon the Consolidation Plan's alleged disparate impact. But Equal Protection jurisprudence focuses on discriminatory intent, not disparate impact. <u>See Washington v. Davis</u>, 426 U.S. 229, 239-41, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). And for good reason. Plaintiffs' disparate impact argument would not just foreclose tax and spending cuts. It would prevent Lawrence from changing its fiscal policy at all. After all, if tax and spending cuts are unconstitutional because they disproportionately harm Lawrence's non-Orthodox population, then tax and spending <u>increases</u> must also be unconstitutional because they would disproportionately benefit the non-Orthodox. More to the point, given the United States' incredible religious diversity, it is difficult to imagine how <u>any</u> complex social or fiscal policy could <u>not</u> have a disparate impact on some religious or social group. Perhaps for this reason, Plaintiffs fail to cite a <u>single</u> case to support their claim that the Court can nullify fiscal policy changes on Equal Protection grounds. And the Court's own research could find none.

Finally, in opposing Defendants' attorneys' fees motion, Plaintiffs appear to argue that, while the desire to lower taxes is not objectionable, the Individual Defendants' decision to fund those

lower taxes by closing the Number 6 School reflected some discriminatory intent. But once again, Plaintiffs' Complaint rebuts any such suggestion. As Plaintiffs' Complaint makes clear, the Individual Defendants decided to close and sell the Number 6 School based on legitimate, non-discriminatory criteria: it "possesses the greatest resale and/or rental value among LUFSD elementary schools." Compl. ¶ 107. Indeed, the Complaint specifically described the Consolidation Plan as the "optimal revenue source to fund flat taxes and/or rebates." Compl. ¶ 138 (emphasis supplied).

C. The Complaint Contained Unnecessary And Potentially Offensive Generalizations

Defendants do not seek attorneys' fees entirely on the basis that Plaintiffs' Complaint was frivolous. They also contend that Plaintiffs should be sanctioned for including numerous "stereotypical and harassing allegations" about Orthodox Jews. Def. Br. at 5. In response, Plaintiffs contend that the Complaint's references to various alleged Orthodox Jewish practices were neither "spurious nor gratuitous." Opp. Br. at 16. Rather, Plaintiffs contend that these allegations served to "explain the group cohesion . . . underlying the bloc voting patterns." Id. at 18.

Plaintiffs have a point. But their Complaint went too far in several respects. First, many of the Complaint's generalizations

about Orthodox Jews concerned alleged customs, such as "grooming habits," that are exceedingly remote from their underlying claims, and seemed to serve no other purpose than to paint Orthodox Jews as a foreign presence within Lawrence. Compl. ¶ 29. Second, although Plaintiffs' Complaint acknowledged that Orthodox Judaism contains many "sub-denominations," Plaintiffs' purported descriptions failed to reflect that underlying diversity. Compl. ¶ 25. For instance, Plaintiffs defined differences in "wardrobes" and "personal grooming habits" as "religious beliefs attendant to Orthodox Judaism," not as religious beliefs attendant to <u>some</u> forms of Orthodox Judaism. Compl. ¶ 29. Likewise, Plaintiffs allege that these practices "manifest" among Orthodox Jewish "adherents," rather than among "some adherents." <u>Id.</u> Plaintiffs may have felt a purported need to plead "group cohesion." Opp. Br. at 17-18. But they wound up using stereotypes to manufacture "cohesion" where none exists.[11]

Finally, Plaintiffs' Complaint contained a few abjectly offensive allegations. For instance, Plaintiffs allege that Defendants' plan would produce a "multiplier effect" because the lower taxes would "bring[] more Orthodox families into the community." Compl. ¶ 110. Then, in the next paragraph, Plaintiffs

_____

[11] The Court takes judicial notice that not all Orthodox Jews dress or groom themselves in a distinctive manner. Many, such as former Attorney General Michael Mukasey, radio host Michael Medved and professional boxers Dmitry Salita and Yuri Foreman maintain a physical appearance indistinguishable from the general population.

allege that "[a]s such, the nefarious nature of the Orthodox majority's plan to unlawfully divert public monies . . . is unequivocal." Compl. ¶ 111 (emphasis supplied). In so doing, Plaintiffs imply that lowering taxes is particularly "nefarious" because the lower taxes might attract more Orthodox Jews to Lawrence. But there is nothing "flagrantly wicked or impious" about enacting public policies that happen to encourage Orthodox Jews to move into a town.[12] Likewise, Plaintiffs allege that Defendants' actions somehow converted "the public BOE into an Orthodox ruling committee" and "establish[ed] Orthodox Judaism as the official religion of [Lawrence]." Compl. ¶ 98. In so doing, Plaintiffs imply that Orthodox Judaism somehow mandates supporting lower taxes and dilapidated public schools. And the Court could understand how some Orthodox Jews might take offense at Plaintiffs' attempt to define modern public policy positions (e.g., lower taxes and reduced public education spending) as inherent religious dogma.

By themselves, these allegations do not warrant awarding Defendants' attorneys' fees, costs, or other sanctions. But, to a limited extent, they do augment the suggestion that Plaintiffs (and Mr. Agostisi) litigated in somewhat less than good faith.

---

[12] Webster's Ninth New Collegiate Dictionary at p. 791. (defining nefarious).

## II.  Mr. Agostisi Violated 28 U.S.C. § 1927

28 U.S.C. § 1927 authorizes sanctions "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," and upon "a finding of conduct constituting or akin to bad faith." Gollomp v. Spitzer, 568 F.3d 355, 368 (2d Cir. 2009).  Here, Mr. Agostisi's conduct fits that description.

Principally, Mr. Agostisi's conduct does so because Plaintiffs' Complaint was "completely without merit."  Indeed, the Complaint sought "to create, not cure, First Amendment and Equal Protection violations."  Incantalupo, 652 F. Supp. 2d at 324.  This is because the First Amendment "mandates governmental neutrality between religion and religion, and between religion and nonreligion."  McCreary County, Ky. v. Am. Civ. Lib. Union of Ky., 545 U.S. 844, 860, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005). Plaintiffs' Complaint, however, asked the Court to overturn the Consolidation Plan because Orthodox Jewish taxpayers supposedly wanted to use the Plan's generally applicable tax cuts to help afford yeshiva tuition.  Compl. ¶¶ 138, 139.  As Mr. Agostisi evidently failed to understand, "neutrality" means just that.  It means that the Government cannot treat a taxpayer's desire to spend money on religious education any differently than it would the taxpayer's choice to buy a nicer car.  See Westchester Day School v. Village

27

of Mamaroneck, 504 F.3d 338, 355 (2d Cir. 2007) (government cannot "inhibit[]" religion).  So, just as the Court could not overturn an identical fiscal plan supported by political conservatives or retirees, Mr. Agostisi should have known that the Court could not "take sides" against Lawrence's Orthodox Jewish population. McCreary County, Ky., 545 U.S. at 860.  And, given the meritless, Constitutionally-offensive nature of the Complaint, the Court can infer that Mr. Agostisi acted in bad faith.  In re 60 East 80th Street Equities, Inc. 218 F.3d 109, 116 (2d Cir. 2000) ("bad faith may be inferred where the action is completely without merit").

In addition, based on the record before it, the Court must conclude that Mr. Agostisi misrepresented at least one fact. Specifically, he claimed that the Number 6 School was "the only elementary school that is currently handicapped-accessible." Compl. ¶ 106.  But the Stanton Leggett Report expressly stated that the Number 6 School was "not fully handicapped accessible," and inferred that the Number 2 School had such accessibility. Incantalupo, 652 F. Supp. 2d at 321 n. 5.  The Complaint relied heavily upon the Stanton Leggett Report's findings and recommendations.  Compl. ¶¶ 104, 105, 112-114, 118, 124.  And Mr. Agostisi annexed a copy of the Report to his declaration.  Agostisi Decl. Ex. 2.  So Mr. Agostisi knew, or should have known, that the Stanton Leggett Report refuted his allegation regarding the Number

6 School's handicap accessibility. Yet he made this evidently false allegation anyway. This was bad faith. See Grand Street Realty, LLC v. McCord, 04-CV-4738, 2005 WL 2436214, *9 (E.D.N.Y. 2005) ("courts have found bad faith where parties knowingly misrepresent the facts or the law"); In re Auction Houses, 00-CV-0648, 2004 WL 2624896, *8 (S.D.N.Y. 2004) (finding "bad faith conduct" that included "making misrepresentations of fact to the court for improper purposes").

Finally, as discussed above, Mr. Agostisi included several unnecessary and, to some degree, inaccurate generalizations about Orthodox Jews. While not necessarily bad faith by itself, the Court finds that Mr. Agostisi's decision to plead these kinds of stereotypical allegations augments its bad faith finding.

III. Attorneys' Fees

As discussed above, the Court finds that, as a prevailing party, Defendants are entitled to "a reasonable attorney's fee as part of [their] costs." 42 U.S.C. § 1988. The Court, however, enjoys "broad discretion in awarding attorneys' fees under § 1988." Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist., 71 F.3d 1053, 1059 (2d Cir. 1995). And this discretion includes deciding "whether requested fees are reasonable." Rivera ex rel. DeJesus v. Commissioner of Social Sec., 05-CV-4465, 2009 WL 1924772, *1 (E.D.N.Y. 2009); see also Louima v. City of New York,

98-CV-5083, 2004 WL 2359943, *56 (E.D.N.Y. 2004). Likewise, the Court also enjoys discretion in deciding appropriate attorney fee awards under § 1927. See In re Green, 422 B.R. 469, 478 (S.D.N.Y. Bankr. 2010); Momentum Luggage & Leisure Bags v. Jansport, Inc., 00-CV-7909, 2001 WL 1388063, *5 (S.D.N.Y. 2001).

Here, Defendants seek $120,000 in attorneys' fees against Plaintiffs and Mr. Agostisi. Exercising its discretion, the Court finds that such an award would be wholly unreasonable. A reasonable fee is "one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." Perdue v. Kenny A. ex rel. Winn, __ U.S. __, 130 S. Ct. 1662, 1672, __ L. Ed. __ (2010) (internal citations and quotations omitted). To that end, the Court should consider many factors, including "the novelty and difficulty of the questions," "the skill requisite to perform the legal service properly," and "the 'undesirability' of the case." City of Riverside v. Rivera, 477 U.S. 561, 568 n.3, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986).

These considerations tip to issuing only a small award. While this case was novel, it was neither difficult nor required any particular legal skill. Indeed, at the initial Order to Show Cause hearing, long before Defendants hired Bingham McCutchen LLP, the Court indicated its extreme skepticism towards Plaintiffs' legal theories. And then, given the time sensitive nature of Plaintiffs'

claims, the Court proceeded to largely draft its Order denying a preliminary injunction and dismissing Plaintiffs' claims before Defendants ever filed their response brief. Defendants' submission ultimately led only to minor revisions in the Court's decision. In short, it did not take a $735/hr attorney, such as Mr. Butler, to defend this case. Quite the contrary, for, while the Court does not wish to encourage shoddy lawyering, in this case even a terse, barely decipherable submission would have resulted in a substantively identical victory. So, ironically, the same utter frivolity that entitles Defendants to attorneys' fees also precludes them from collecting more than a mere fraction of what they expended to retain Mr. Butler's high-priced services.

Additionally, defending this case was hardly "undesirable." In the Court's experience, Establishment Clause issues are generally more interesting and less document intensive than complex commercial litigation. And, in this case, Defendants' attorneys were well-paid and enjoyed significant publicity in the local press for their work in this matter. Additionally, the Court takes judicial notice that two non-profit organizations filed amicus curiae on Defendants' behalf at the appellate level. This suggests that, had Defendants inquired, they might have been able to obtain perfectly competent pro bono counsel.

Finally, the Court notes that – while awarding fees serves the valid purpose of deterring frivolous litigation – such a fee award in a § 1983 case serves as a "potential chilling effect" on Congress' "chosen instrument . . . to vindicate a policy of the highest national priority." Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994). So, in deterring frivolous cases, such as this one, the Court does not want to inadvertently deter potentially meritorious suits.

Taking all these considerations into account, the Court awards Defendants "reasonable" attorneys' fees in the amount of $5,000 -- $2,500 against Defendants under § 1988, and $2,500 against Mr. Agostisi under § 1983.

## CONCLUSION

Defendants' motion is GRANTED IN PART DENIED IN PART. The Court awards Defendants' $5,000, to be assessed equally against Plaintiffs and Mr. Agostisi. Defendants' motion for a status conference concerning their pending attorneys' fees motion is, accordingly, DENIED AS MOOT.


SO ORDERED


_____
            /s/
Joanna Seybert, U.S.D.J.

Dated:    Central Islip, New York
          June 10, 2010